## FEDERAL LIFE INS. CO. v. HERRING.*
### (No. 10864.)

(Court of Civil Appeals of Texas. Fort Worth.
Dec. 13, 1924. Rehearing Denied
Jan. 24, 1925.)

**1. Insurance ⬒665(5)—Evidence held to sustain finding that insured died from bodily injury inflicted independently of other causes through accidental means.**

Evidence *held* to sustain finding that insured died from bodily injury inflicted directly and independently of all other causes through external, violent, and accidental means.

**2. Insurance ⬒631—Legal obligation and effect of policy held sufficiently pleaded.**

Petition alleging issuance of policy of accident insurance, copy of which was attached, that insured received blow which independently of other causes resulted in death, and that insurer refused to pay amount it became liable for, *held* sufficiently to plead legal obligations and legal effect of policy.

**3. Appeal and error ⬒1060(1)—Trial ⬒120(2)—Counsel's argument referring to deceased's declarations not shown by evidence held objectionable and reversible error as violation of rule.**

In action on accident insurance policy, where there was no direct evidence of injury in certain manner, counsel's argument, implying that certain witnesses, if asked, would have testified that deceased said he was so injured, *held* objectionable and reversible error, as violation of rule 39, which confines argument to evidence and to arguments of opposing counsel.

**4. Appeal and error ⬒925(3)—Argument as to declarations of deceased as to injury held not ignored on ground declarations were admissible.**

Where alleged declarations of insured as to an injury claimed to have caused his death were excluded without objection, and are not in the record, argument implying that such declarations were made cannot be ignored, on ground that such declarations were admissible, as it would be necessary to base one presumption on another.

**5. Appeal and error ⬒205—Failure to object to court's ruling on exclusion of evidence precludes review.**

Failure to object to exclusion of evidence is concession that excluded declarations were not admissible as res gestæ, and review thereof is precluded.

**6. Appeal and error ⬒992—Trial court is judge in first instance whether statements offered as part of res gestæ are free from imputation of design or hearsay, or are self-serving.**

On statements being proffered as part of res gestæ, trial court in first instance determines whether they are entirely free from imputation that they were made with design or were purely hearsay and self-serving, or, on

contrary, appear to be instinctive rendition of explanatory facts.

Buck, J., dissenting in part.

Appeal from District Court, Stephens County; C. O. Hamlin, Judge.

Action by Elizabeth Herring against the Federal Life Insurance Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

J. L. Goggans, of Breckenridge, and W. L. Moore, of Dallas, for appellant.

Will R. Saunders and V. L. Shurtleff, both of Breckenridge, for appellee.

BUCK, J. Mrs. Elizabeth Herring filed suit in the district court of Stephens county against the Federal Life Insurance Company alleging that her husband, Charlie Gee Herring, prior to his death had an accident policy in the defendant company, in the sum of $5,000. That on or about July 19, 1922, her husband was employed as an oil driller, working on an oil well near the town of Eliasville, Young county, and that, while so employed and in the regular course of his employment, he received an injury in the right side in the region of the appendix by receiving a blow or accidently striking his right side against some external object, and as a result thereof his appendix was bruised and bursted, which said condition is generally known as traumatic appendicitis, and that her husband died as a result of said trauma or injury. She alleged that she had made application and proof of death to the defendant company, but said company had failed and refused to pay the amount of said policy. She prayed for a judgment for the face value of the policy, with 12 per cent. penalty and reasonable attorneys' fees, which she alleged to be $1,000.

In answer to objections filed by defendant, the plaintiff filed a trial amendment, in which she alleged:

"That on or about July 19, 1922, Charlie Gee Herring did sustain a bodily injury through external, violent, and accidental means, which resulted independently and exclusively of all other causes in his death. That no other person was present when said injury was received, and a better description of the manner in which said injury was received is unable to be given by reason of said fact."

The cause was submitted to a jury on one special issue, to wit:

"Did Charlie Gee Herring on July 19, 1922, sustain a bodily injury through external, violent, and accidental means, which resulted independently or exclusively of all other causes in his death? Ans. Yes."

From a judgment for plaintiff in the sum of $6,600, with interest, the defendant has appealed.

⬒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted March 18, 1925.

This case is dependent largely on the same statement of facts as cause No. 10674, Texas Employers' Insurance Association v. Elizabeth Herring, 269 S. W. 249, which was affirmed by this court on May 17, 1924, motion for rehearing overruled October 18, 1924. There are some differences in the evidence, which we will hereinafter note, but in the main the testimony is the same.

[1] Appellant's first four propositions attack in various forms the finding of the jury that Herring's death was caused by "bodily injury through external, violent, and accidental means, which resulted independently or exclusively of all other causes in his death." In the former case, Mrs. Herring testified that her husband, on his return from the well and while he was suffering severe pains, told her that he had been injured. In the present case she testified:

"He drove the same car we used in going to Eliasville. It was about three hours after that when I saw him again—between 2 and 3 o'clock. I saw him next when he drove up in the car alone. He was driving the car with one hand and holding his side with the other. When he left me three hours before that his appearance was fine as to health. I saw him in the car with one hand to his side, and when the car stopped I assisted him out of the car. He told me what had happened to him."

Dr. B. F. Edwards, after stating that he had been the family physician for three or four years, though he had never waited on Mr. Herring professionally, testified:

"I was called to see Mr. Herring professionally during July, 1922. I saw him on the 23d of July, 1922. I had seen him three or four days prior to that time, however, first on the 19th of July, I think it was. I do not remember who called me to see Mr. Herring, but think the call came from his wife to me. My best recollection is that I saw him shortly after noon on the 19th of July, around 2 or 3 o'clock. I saw him at his home near Eliasville. When I first saw him then he was on the gallery of his home propped up by pillows in a bending or cramped position, and appearing to be in great pain and suffering. In fact, he was suffering great agony and pain at the time I first reached him. His wife, Mrs. Elizabeth Herring, was present at the time I first saw him. I made a physical examination of Mr. Herring on that day. I placed him upon the bed, undressed him, and made a thorough physical examination of his body, together with the history of what was the trouble with him, from the patient. His wife was present at the time I made this examination. I based my diagnosis upon the objective symptoms of injury I found on his body, which were marked discoloration, enlargement, and swelling. * * * "No person, other than Mr. Herring, made any statement to me or in my presence at the time I first saw Mr. Herring as to how he was injured."

We think that the testimony of plaintiff, the wife of the deceased, and of his family physician, as shown in the excerpt from the statement of facts hereinabove, as well as perhaps from other testimony in the statement of facts, sustains the findings of the jury that the deceased died from bodily injury inflicted directly and independently of all other causes through external, violent, and accidental means, and that propositions 1, 2, 3, and 4, should be overruled.

[2] Proposition 4 is as follows:

"Plaintiff in the lower court did not sufficiently plead the legal obligations created by the insurance policy sued upon herein, and does not plead the legal effect thereof."

In her second amended petition, plaintiff alleged that:

The defendant company issued "its policy of insurance in writing, whereby it insured the life of said Charlie Gee Herring for the sum of $5,000 against accident, which resulted to the said Charlie Gee Herring, which would cause his said death, said policy being issued for the benefit of the plaintiff herein, and the defendant thereby promised to pay, and became bound and liable and obligated to pay, said sum of $5,000 to the plaintiff upon the death of the said Charlie Gee Herring, as is more fully shown by policy No. S. C. 22893, reference to which is here made, and said policy is hereby made a party hereof, the same as if herein fully written."

In her trial amendment she further pleaded as is hereinabove shown. While it does not appear from the transcript that the original policy or a copy thereof was in fact attached to the pleading, yet in the oral argument it was agreed that said policy was treated as if attached. A copy of the policy appears in the statement of facts.

Appellant cites the cases of Guadalupe County v. Johnston, 1 Tex. Civ. App. 713, 20 S. W. 833; Burks v. Watson, 48 Tex. 107, and other cases supporting the contention that the petition must not only plead the facts upon which plaintiff relies for recovery, but must state the legal effect thereof. As confined to the present suit, plaintiff was required, not only to allege that the defendant had issued its policy insuring the deceased against death caused by his sustaining a bodily injury through external violence and accidental means which resulted independently or exclusively of all other causes in his death, but that defendant was bound and obligated by the terms of its policy to pay the amount named in the policy upon his death from such cause. The plaintiff pleaded that:

"On or about the day and date above mentioned the said Charlie Gee Herring, while in the course of his employment received a blow or lick, or came in contact with some external object striking him in the right side, which produced or caused, solely and independently and exclusive of all other causes, such a traumatism or injury as resulted in his death, and in this connection the plaintiff alleges that the accidental injury so received by Mr. Herring

caused and produced, solely and exclusively and independently of any natural condition or disease, the death of the said Charlie Gee Herring."

Plaintiff further alleged that:

"Said defendant company has failed and refused to pay said sum, and still fails and refuses to pay same or any part thereof, and on account thereof the said defendant has become liable and bound to pay unto this plaintiff, in addition to the face value of said policy, 12 per cent. damages on the amount thereof," etc.

We think, in view of all the pleadings of plaintiff hereinabove mentioned, and in view of the agreement, that the policy itself should be considered as a part of plaintiff's pleadings, that the assignment should be overruled, and it is accordingly ordered.

[3] The other assignments urged in appellant's brief are to the argument of counsel for the plaintiff below. This argument by V. L. Shurtleff, counsel for plaintiff, was delivered as the closing speech to the jury, and he said:

"They say that because that man [referring to deceased] who had been on the road all night failed to tell them that he fell from the derrick stool, that he did not do it. But if they could prove by Otto Kidd, who met him a few hundred yards from the well and had a conversation with him, if they could prove by Otto Kidd that he did not tell him he did not fall from the derrick stool, it would be"

—whereupon counsel for defendant interposed objection to this line of argument, and stated that Kidd's testimony had been passed on by the court and excluded. Mr. Shurtleff then proceeded as follows:

"They argue that this man did not tell Dr. McCollum he fell from the derrick stool—I say if they could prove by Otto Kidd, who met him near the well, that he did not tell him he fell from the derrick stool, while he was in his right mind, before he had taken that all night ride, there would be some force in the argument, but to wait on the man four days, in his agony, driven all night long and say I will hold you accountable because you did not tell this man, that is begging the question."

The court then said:

"Judge Shurtleff, one moment. I want to rule on the question, and want to instruct the jury the testimony of Otto Kidd is before the jury; the court excluded part of it; any reference to what might have been testified by Otto Kidd will not be considered by the jury."

Whereupon Mr. Shurtleff proceeded as follows:

"There was no suggestion what might have been testified to, but I do say, gentlemen of the jury, that this argument is fairly deducible from the testimony; that they proved by Dr. McCollum that four days later he did not tell him that he fell from the derrick stool, but they don't ask Otto Kidd whether or not he

269 S.W.—17

told him that he did not fall from the derrick stool. Our mouths were closed when they were faced by the man that met him as he came from the well, one hand on his side, and one on the steering wheel in such manner he could not take his car from the road. They were anxious to ask the nurse who attended him in the condition he reached Fort Worth whether or not he told her how the accident happened, but they dare not ask Dr. Edwards if he told him that he fell from the derrick stool."

Whereupon counsel for defendant objected again to the argument and the court replied, "Yes," but did not further instruct the jury, and counsel for plaintiff was allowed to proceed as follows:

"I say if they could prove by people who talked with him [referring to deceased] when his mind was clear, I say if they could prove by this little woman [plaintiff who was present in the courtroom at the time], if they could prove by Dr. Edwards, if they could prove by Otto Kidd, the man who first saw him, that he said nothing to them about having suffered an accident, then they could in good faith come before a jury and argue that nothing was said about it, but so long as they refuse to ask these people the questions and then invite a jury of 12 good men and true of Stephens county to send this little woman from the courthouse with a verdict against her, because men in Fort Worth and nurses in Fort Worth who attended him in the condition he was in when he got there say he said nothing to them about it, as long as I can raise my voice in her behalf, I will denounce that way of undertaking to try a case as being unfair to the plaintiff here."

Other argument of the same character was made by the same counsel for plaintiff, over the objections of defendant.

The writer thinks this argument was calculated to induce the jury to believe that if Otto Kidd, Mrs. Herring, and Dr. Edwards had been permitted to testify as to what the deceased said to them on the occasions when the witness first saw him after he left the well, they would have said that he told them he had been injured in some accident. He is further of the opinion that such testimony, at least, from the witness Kidd and Mrs. Herring would have been admissible as res gestæ. In McGowen v. McGowen, 52 Tex. 657, the Supreme Court held, in a divorce suit by the husband against the wife, that statements made by the wife about the time of the separation between the husband and wife, and out of the presence of the husband, were admissible as res gestæ. The court said:

"Under the circumstances as developed by the testimony, the declarations of Mrs. McGowen made but a short time before the separation, and in regard to it, and when, as described by one of the witnesses, 'she seemed to be in great distress and crying,' made, it may reasonably be inferred, to the witness as a friend and adviser, we are of opinion, were so

much a part of the final act of separation, and explanatory of its cause as to have been proper for the consideration of the jury, in connection with all the other facts and circumstances of the case."

These questions involved the state of mind of the defendant at the time whether she expressed a want or consent to the separation or otherwise, or whether she was opposed thereto, etc.

In Travelers' Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437, the Supreme Court of the United States held that, whenever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. That the declarations of the party himself are evidence to prove his condition, ills, pains, and symptoms, whether arising from sickness, of from an injury by accident or violence. That the declarations of deceased in that case as to the cause of his injury, as that he had fallen down stairs, made immediately after the occurrence, were admissible as part of the res gestæ to show such cause. In the cited case is was material to recovery to show that assured died from the effects of an accidental fall down the stairs in the night. The wife of deceased was permitted to testify:

"That the assured left his bed Wednesday night, the 18th of July, 1866, between 12 and 1 o'clock; that when he came back he said he had fallen down the back stairs and almost killed himself; that he had hit the back part of his head in falling down stairs; * * * she noticed that his voice trembled; he complained of his head, and appeared to be faint and in great pain."

The son of assured testified:

"That he slept in the lower part of the building, occupied by his father; that about 12 o'clock of the night before mentioned, he saw his father lying with his head on the counter, and asked him what was the matter; he replied that he had fallen down the back stairs and hurt himself very badly."

This testimony was held by the court to be admissible.

In M., K. & T. Ry. Co. v. Moore (Tex. Civ. App.) 59 S. W. 282, it was held that declarations by one injured as to what caused the accident, though made several hours thereafter, were admissible as a part of the res gestæ. Statements of bodily feeling are a part of the res gestæ, if made at the time of the pain or suffering, and need not be made at the time of the original injury. St. Louis & S. W. Ry. Co. v. Gill (Tex. Civ. App.) 55 S. W. 386; T. & P. Ry. Co. v. Lee (Tex. Civ. App.) 51 S. W. 351, writ of error denied in 51 S. W. 351, 21 Tex. Civ. App. 174, 57 S. W. 573; I. & G. N. Ry. v. Cain, 35 Tex. Civ. App. 539, 80 S. W. 571. Jones, Commentaries on Evidence, vol. 2, p. 825, § 348, quoting from a decision cited, says:

"The declarations must be calculated to unfold the nature and quality of the facts which they are intended to explain; they must so harmonize with those facts as to form one transaction. There must be a transaction of which they are considered a part; they must be concomitant with the principal act, and so connected with it as to be regarded as the result and consequence of coexisting motives."

Where one injured in a vehicle drove directly and immediately to a house a short distance away, her declarations shortly after she alighted concerning her physical condition were properly admitted. H. & T. C. Ry. v. Thompson (Tex. Civ. App.) 138 S. W. 1066, and cases cited. Many other decisions might be cited sustaining the admissibility of statements made by the deceased in the instant case a short time after he began to suffer, and made while he was continuing to suffer, as to the cause of such suffering, and as to whether or not he had been hurt.

It is evident from this bill of exception that the objection to Otto Kidd, Mrs. Herring, and Dr. Edwards, telling what statement, if any, the deceased made to them, respectively, as to having received an injury, was made by the defendant, and that, if the testimony had been admitted, it would have been favorable to plaintiff. Believing, as the writer does, that such testimony was admissible, he is of the opinion that no reversible error is shown by reason of this argument, and that the judgment of the trial court should be affirmed. But the majority do not agree with this disposition of the case. Their views are expressed in the following discussion, by Chief Justice CONNER:

The majority concur in the general statement made by our associate and in the ruling announced by him upon the sufficiency of the pleadings, but we have been unable to agree that the assignments relating to the argument for plaintiff below should be overruled. The argument complained of was by Mr. Shurtleff for plaintiff, delivered during the closing speech to the jury, and is sufficiently set out by Mr. Justice BUCK in his opinion, and need not therefore be here repeated.

The vital issue in the case was whether the deceased, Charlie Gee Herring, on July 19, 1922, within the meaning of the policy on which the plaintiff declared, "sustained a bodily injury through external, violent, and accidental means which resulted independently or exclusively of all other causes in his death." It is not contended in behalf of appellee that there was any direct evidence tending to show the manner in which the deceased received his injury, if injury he did receive. The plaintiff's theory upon the trial apparently was that the deceased was struck in the side with the derrick stool, and hurt in a fall. The derrick stool was used by the deceased as a driller to stand

on while manipulating the cable attached to the drill, and, so far as the evidence tends to show, there was no other thing in use or at the place where he was working with which an injury of the character claimed could have been inflicted, unless possibly the crossbar or handles affixed to the cable with which it was manipulated. But it is mere conjecture to say that these handles could have been given a sudden or violent turn that hurt the deceased in the side, for the reason that the position of these handles with reference to the deceased's body while standing is not shown in the evidence. That is, it is not shown whether they were above or below the point on the deceased's side where his wife and the doctor testified the discoloration was found. And, in order to give a clear setting for the argument, and to show how acutely the evidence offered in behalf of appellant conflicted with the theory of plaintiff's case, we will briefly refer to the testimony.

Mrs. Elizabeth Herring, the wife, referred to in the argument of counsel as a "little woman," testified that prior to the injury the deceased was in good health. Several other witnesses also testified that theretofore he had been in good, or apparent good, health. The wife testified that some three hours after her husband had left that morning for work he returned, driving his car with one hand and holding his side with the other; that he was suffering intense pain, and that his side was black and blue and swollen. Dr. Edwards also testified that when he was called to examine the deceased he found his side discolored and swollen, and that Mr. Herring was suffering great pain, and, substantially, he gave it as his opinion that the discolored side was caused by some external blow or violence which resulted in traumatic appendicitis and death. In answer to a question, however, he stated to Mr. Moore, of counsel for appellant, that "no one could tell positively what caused his death." He further stated that the condition he found "is not usually found in appendicitis cases." The only person present at the time and place where it is urged that Mr. Herring was injured was Mr. Claude Campbell. He testified to the effect that he did not see the deceased fall or anything strike him, and heard no complaint made, except that the deceased complained of his side hurting him, or that he had hurt his side. He further said that, "when Herring said his side hurt him or he had hurt his side, he did not undertake to tell what caused it"; that he did not "hear anything that sounded like a man falling off a derrick stool or anything of that kind"; nor did the testimony of this witness indicate that there was anything other than the stool upon which Mr. Herring could have been hurt.

The next witness was Mr. Otto Kidd, a neighbor, who met Herring going home from the well. He testified that Herring seemed to be in a lot of pain and distress, and was driving with one hand and holding the other to his side. There was nothing in the testimony of this witness to show that Herring received any injury; nor did this witness make any statement of a declaration made by Herring as to how his injury occurred.

E. C. Shannon testified that he was working on the same well on the morning shift; Mr. Herring working in the evening. That when Herring got to the well to work that day about 10 minutes to 12 he asked him how he was feeling and Herring said "he was feeling bad, and did not believe he could work. That is the talk we had there before he went to work that day. * * * Herring had made some complaint to me about not feeling well within two or three days before that. He said something about his stomach bothering him. * * * He did make complaint on that day when he come to work, and I also heard him speak of it two or three days before that." This witness further testified in answer to a question that he considered the derrick stool "very good"; that he "did not see any evidence on the floor of the derrick when I returned that day of the derrick stool having slipped or fallen on the derrick floor."

M. B. Hale testified that he was a drilling contractor. That the first time he saw Mr. Herring after the alleged injury was the next day. That he went to his house and found him in bed and asked him how he was feeling, and Herring said he was feeling "mighty bad." He did not say what was the matter with him. When he asked him what was the matter with him "he told me his stomach was cramping him, giving him trouble. * * * He was suffering a good bit, and I asked him if the doctor had been to see him. He told me he had, and I asked him what seemed to be the matter with him, and he said that he did not know. I asked him what the doctor said was the matter with him, and as well as I remember he said the doctor said he did not know what was the matter with him. * * * I remember him stating he had similar troubles before this with his stomach. He told me that he had stomach trouble before that, and laid off the previous well—on the well he was drilling before he was drilling for me."

H. S. Renshaw testified, among other things that he was an interne at St. Joseph's Hospital in Fort Worth when Mr. Herring was admitted to that hospital, and that as such interne he made "the general history and examination record of this case, which is attached to these interrogatories and is a part of the record of St. Joseph's hospital." That he got the information that he entered in the hospital record under head of "general history and examination record" from C. G. Herring himself. That it was elicited in answer to questions, and volunteered. That

at the time Mr. Herring gave this information he was rational. That he did not see any bruises or discoloration in the region of the appendix.

In the general history and examination record to which the witness referred, under the head of family history, appears the statements that the father of Mr. Herring was in good health at 64; that his mother died at 54 with catarrah of the stomach; that he had two brothers and three sisters living and in good health. No history of tuberculosis or cancer in family. Under the head of personal history was stated that patient had measles, mumps, and whooping cough when a child. Had typhoid fever when nine years old, and was sick about two months. Had malarial fever and chills from age of two until seven. Had influenza a few years ago. Had had no operation or injuries.

Under the head of "present complaint" is the following:

"Four days ago took sick with sour stomach and heartburn. Stomach felt distended. Had many eructations (belching) of sour gas. Has had several similar attacks in the last three years, but none of which lasted as long as this one. Thinks it was from chewing tobacco, as they would pass off when he quit chewing. Attacks had no particular time relation to his meals."

Under the head of "physical examination" was recited that:

The patient "is a male, age 37; occupation oil driller; rather obese. Head and neck, no abnormalities seen. Tongue heavily coated. Teeth good; abdomen slightly distended, tender and particularly sore in rt. illiac region (flank). Heart: double murmur heard, diastolic (dilation or fillings) and systolic (contracting or emptying), former heard best at base, and transmitted to the great vessels of the neck. Systolic heard best at apex. Pulse normal. Lungs: no adventious sounds (coming from without) heard."

Dr. C. H. McCollum, the physician who operated on Herring, testified that he was 47 years of age, resided in Fort Worth, and that he had graduated from Barnes Medical College, St. Louis, Mo., which is a recognized school. That he had been engaged in the practice of medicine and surgery for 21 years. That he operated on Mr. Herring for appendicitis on July 22, 1922, at St. Joseph's Infirmary. That:

"I made a thorough examination of the patient before operating on him. When I examined him I found him in an exhausted condition, suffering pain in the right side of the belly, some fever, abdomen distended and rigid. I gave diagnosis as appendicitis, and based the diagnosis on his history and present symptoms. * * * On operating on the patient I found a ruptured, gangrenous appendix, with free pus in the abdomen. There were adhesions about

the side of the appendix and all around the appendix. He had gangrenous (putrification) appendicitis. It was just an ordinary natural case of its kind. As far as the case itself is concerned, it was like all of them of its kind, but he had a very bad heart in connection with the appendicitis, and had traveled by way of auto the night before from his home. This trip had produced a great deal of exhaustion. He had nothing unusual except the ruptured and gangrenous appendix, a bad heart and general exhaustion. I found no sympton, sign, mark, or trace of any bodily injury on the body and person of Charlie Gee Herring. I do not recall any statement to me by the said Charlie Gee Herring of any bodily injury. In fact he made no such statement to me. It was a plain, simple case of appendicitis. * * * The condition in which I found him at the time of my examination was produced by natural causes and no other. In my opinion, as a physican, the sole cause of the death of Charlie Gee Herring was a ruptured gangrenous appendix, a bad heart, and brain complication. There was no contributing or secondary cause of the death of Charlie Gee Herring, except as I have already mentioned."

Sister M. Johanna testified that she resided at St. Joseph's Infirmary, Fort Worth, and was supervisor of the operating room, and had been there three years; that Charlie Gee Herring was admitted to St. Joseph's on July 22, 1922, and remained there two days. That:

She "saw the body in the region of the appendix after it was shaved, and before it was painted with iodine, but did not see any bruises or discoloration of any kind on his body in the region of the appendix. * * * I had every opportunity to ascertain whether or not there was any bruise or discoloration of any kind on Mr. Herring's body in the region of the appendix on July 22, 1922."

O. R. Grogan testified that he was a physician and surgeon and resided in Fort Worth and assisted Dr. McCollum in operating on Mr. Herring. That:

He "carefully examined the body of Mr. Herring in the region of the appendix and at the particular spot where the incision was made, after it had been shaved. There were no bruises or discolorations on his body. * * * I have operated on between 400 and 500 persons for appendicitis, probably before July 22, 1922. A gangrened appendix is one where the circulation has been cut off from the appendix by inflammation, and it becomes gangrened and begins to slough. As to appendicitis resulting from traumatism (injury) or an external force, traumatism would be a rare occurrence. I have never seen a case, and I suppose I have seen between 1,000 and 1,500 cases of appendicitis. In my examination of the body of Mr. Herring there was no evidence of any injury or traumatism, no discoloration and bruises; it would be almost a physical impossibility to injure the appendix by external force. It would be difficult on account of the appendix being situated so deeply in the abdomen. As to the effect upon a patient of an external blow

of sufficient violence to injure or rupture the appendix and produce appendicitis and to produce the condition I found in Herring, will say that a blow sufficient to cause the rupture of Mr. Herring's appendix would have caused instant death. The skin would be bruised, lacerated, and discolored. It would have caused more or less discoloration of the fat. The muscles would have been lacerated, bruised, and black. A blow sufficient to cause such a rupture would have bruised all the intestines practically. * * * The appendix was situated on the back side of the cecum (blind gut or cul-de-sac), which would make it still more impossible for the appendicitis to have been of traumatic origin. No cases of traumatic appendicitis have come under my observation. I have never heard of any. * * * I found there was considerable fat in Charlie Gee Herring's body between the skin of the abdomen and the appendix. A larger amount of fat was found there than is found in the average man at that place. The distance from the outer skin to Charlie Gee Herring's appendix was between four and five inches. In my opinion, if Herring had received a blow in the region of the appendix sufficient to have ruptured the appendix and produce the condition in which the appendix was found at the time of the operation, it would have caused instant death. In my opinion, if he had received such a blow he could not, within an hour afterwards, have walked to a Ford car and then driven the car a distance of approximately three-quarters of a mile without aid."

In the condition of the evidence, it seems apparent to the majority that the argument of counsel was in violation of Rule 39, governing district and county courts, which requires counsel "to confine the argument strictly to the evidence and to the arguments of the opposing counsel." It is clear that there was no evidence to the effect that the deceased was hurt by or upon the stool upon which he had been standing, or by any other specific thing shown in the testimony, and it is not made to appear by facts recited in the bill of exception relating to the matter (though in the argument it is so assumed) that the argument quoted was in reply to argument of counsel upon the other side. Had counsel stated to the jury in express terms that, had appellant's counsel asked Otto Kidd, Dr. McCollum, and deceased's wife, the answers of those parties would have been that the deceased declared that he fell off of the stool and hurt his side, no one, the majority thinks, could reasonably say that the argument would have been proper or without prejudice. While no express statement of that character was made in the argument objected to, yet such, as it appears to the majority, was the very plain implication. It is reasonably certain that counsel for appellant so interpreted the argument for he objected thereto, and it seems likewise reasonably certain that the court so understood the implication of the argument for he interrupted counsel and ruled that "any ref-

erence to what might have been testified by Otto Kidd will not be considered by the jury." It is easily inferable, therefore, not only that the jury understood the argument as did the court and counsel for appellant, even though counsel making the argument did not so understand and so intend it, if that can be said. It was held by our Supreme Court in the case of C., R. I. & T. Ry. Co. v. Rosa Langston, 92 Tex. 709, 50 S. W. 574 (quoting from the note) that:

"Rule 39, requiring counsel to confine their argument 'to the evidence and to the arguments of opposing counsel,' is violated when an attorney, over objection made, is permitted to argue an issue of fact, which there is no evidence sufficient to raise, though his argument consists in inferences sought to be drawn from the record and testimony in the case."

It was, of course, legitimate for counsel to explain the failure of deceased to make statements or complaints as to the manner of his injury to the physicians, internes, and nurses at Fort Worth, by referring to and dwelling upon the condition of deceased and his long ride to Fort Worth and the pain under which he was suffering and his general debilitated condition, but to, in effect, further convey the impression to the minds of the jury that, had inquiry been made of Otto Kidd, the doctor, and deceased's wife, an explanation of the manner of his injury would have been made consistent with the theory upon which the plaintiff was proceeding was objectionable. Not only so, but the argument was repeated and insisted upon after the court's interruption and indication that it was in violation of the rule.

[4, 5] Nor do we think the assignments of error under consideration and the objectionable character of the argument can be ignored on the ground that the declarations of the deceased relating to the manner in which he received his injury, if in fact he did receive an injury, made to his wife, to Otto Kidd, and to the doctor, and others, were part of the res gestæ, and, as such, admissible. It is, of course, clear, under elementary rules relating to the subject, that his declarations and acts indicative of pain and suffering were admissible, and they were in fact admitted, but this record is entirely silent as to what declarations, if any, the deceased did make indicating the fact and the manner of his injury. The record does show that those declarations, whatever they were, were excluded by the court, and no objection to that ruling is presented in the record before us. The inference is plain that counsel for appellee in failing to object to the ruling of the court in that respect is in the attitude of conceding that the excluded declarations were not admissible as res gestæ, and they are not before us by bill of exception or otherwise so as to enable this

court to say that the court's ruling was wrong.

In Jones' Blue Book on Evidence, vol. 2, § 349a, this is said:

"The declarations of the party to his physician or to other persons as to the *cause of the injury*, or those charging liability upon other persons, are not admissible when not made at the time of the injury."

In support of the text quoted the author cites numerous decisions in a note.

[6] The majority, of course, do not wish to convey the impression that in order to make such declarations admissible as part of the res gestæ it is necessary that they shall in every instance be precisely contemporaneous with the injury; but we think it will be found that they must be so nearly so, and made under such circumstances, as to exclude an inference that they were studied and intended as an aid in support of a contemplated action. Upon statements being proffered as part of the res gestæ, it is the function of the trial court in the first instance to determine whether the statements are entirely free from an imputation that they were made with design or were purely hearsay and self-serving, or, on the contrary, appear to be an instinctive rendition of the facts explanatory of the pain or suffering under which he is laboring. And the court below in the case before us having ruled, after having heard the language of the deceased that was offered, and considered all of the other circumstances relevant thereto, his ruling will not be now determined by the majority to be erroneous. To do so we must first presume that the circumstances were such as to make the declarations competent and admissible as res gestæ, and then further presume that the declarations had the probative force imputed in the argument of counsel. To so presume would be to violate the well-settled rule which forbids the building of one presumption upon another. G., C. & S. F. Ry. Co. v. Davis (Tex. Civ. App.) 161 S. W. 932; Fort Worth Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S. W. 1130. Nor will the failure of appellant's counsel to develop the deceased's declarations to the parties named be accepted as a justification for the argument. These declarations, in view of the trial court's unassailed ruling and the condition of the present record, must be treated as incompetent. It is to be remembered that the burden was upon the plaintiff, and not the defendant. It was upon the plaintiff to show, if it could be done by any competent evidence, that the deceased was actually injured in some manner which proximately resulted, independently of other causes, in his death.

We conclude, on the whole, that for the error discussed the judgment should be reversed and the cause remanded.

T. H. Conner, Chief Justice.

Therefore the judgment below is reversed and the cause remanded.

BUCK, J., dissenting.