**WEBB et al. v. HARDY.  (No. 10888.) ***

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 13, 1924. Rehearing Denied Jan. 24, 1925.)

1. **Brokers** ⟨key⟩56(2)—**Rule of liability for commissions on sale at reduced price to broker's customer, inapplicable to facts.**

Rule that where owner of land secures broker to look up purchaser at given price, and subsequently sells at reduced price, to purchaser produced by broker, broker is entitled to commission, *held* to have no application where owner at time he contracted to sell to another did not know, or have reason to suspect, that the person produced by broker was in fact to be the purchaser.

2. **Appeal and error** ⟨key⟩1010(1)—**Judgment on mere speculation, surmise, or suspicion, cannot stand.**

While judgment must not be reversed on facts if there be any substantial evidence to support it, one resting on mere speculation, surmise, or suspicion will not be allowed to stand.

3. **Brokers** ⟨key⟩86(1)—**Judgment for broker on theory of owner having with knowledge indirectly sold to broker's customer unsupported by evidence.**

Judgment for broker for commission on theory that owner, when making contract of sale at reduced price to another, knew, or had reason to suspect, that the person produced by broker was in fact to be the purchaser, *held* unsupported by evidence, but to rest on speculation, surmise, or suspicion.

4. **Indemnity** ⟨key⟩13(2)—**No recovery over between parties guilty of fraud.**

One of two persons, guilty of fraud against plaintiff, cannot, on plaintiff recovering judgment against him, have judgment over against the other.

Appeal from District Court, Baylor County; J. H. Milam, Judge.

Action by D. M. Hardy against Sidney Webb and others. Judgment for plaintiff against the named defendant, and for such defendant over against defendant Lee Anderson, and said defendants appeal. Reversed and rendered.

⟨key⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted March 18, 1925.

Penix, Miller & Perkins, of Mineral Wells, and J. A. Wheat and J. H. Wood, both of Seymour, for appellants.

Taylor & Taylor and J. L. Lackey, all of Wichita Falls, for appellee.

BUCK, J. D. M. Hardy brought this suit in the district court of Baylor county against Sidney Webb, Lee Anderson, and J. H. Turbeville. Plaintiff alleged, in substance: That about the first day of May, 1921, he was engaged in selling real estate as a broker, and about said date defendant Sidney Webb listed with him for sale a tract of land, of some 10,000 acres, situated in Baylor county, at the price of $15 per acre, or upon such price as he, the said Sidney Webb, and the prospective purchaser might agree upon and upon such conditions as might be agreed upon when said sale was consummated. That for his services in procuring a purchaser or in selling said land upon the conditions aforesaid, plaintiff was to receive the sum of $2,000 commission, which was to be paid by defendant to the plaintiff at the time of making said sale. That in pursuance of said agreement plaintiff on or about the 10th day of May, 1921, procured a purchaser for said land and premises, in the person of J. H. Turbeville, of Baylor county, who, after some negotiations, purchased said land from said Webb at a price agreed upon between said Turbeville and Webb, which plaintiff is informed and believes was at the price of $13.50 per acre. That plaintiff alleged that after the land was listed with him and the said Turbeville had been procured by plaintiff as a purchaser therefor, and after plaintiff had gone to some trouble and expense in securing and interesting the said Turbeville and had got the deal well started, defendants Webb, Turbeville, and Anderson, acting in bad faith and in collusion with each other, conspired and planned to consummate said sale between themselves with a view of beating and cheating plaintiff out of his commission. That said Anderson and Webb, as coconspirators and for the purpose of defrauding plaintiff out of his commission, entered into a fraudulent contract whereby the defendant Lee Anderson was to buy the property from Webb, representing it was for himself, but in truth and in fact for the defendant Turbeville. That said Anderson was financially unable to buy said land, which fact was known to the defendant Webb, and that the deal was consummated between said Webb and Turbeville and the deed was made directly to J. H. Turbeville, who was procured by plaintiff, and that by reason of the allegations pleaded, defendants and each of them became indebted to and liable to plaintiff in the sum of $2,000, with interest.

The defendant Webb answered by a general denial and by special answer: That he did in the early spring of 1921 list approximately 10,000 acres of land with plaintiff for sale at $15 per acre. That the plaintiff did show said land to the defendant Turbeville about the month of April, 1921. That said Turbeville declined to purchase said land at the time, and all efforts to sell to said Turbeville ceased and were abandoned. That on August 30, 1921, defendant Webb in good faith sold said land to his codefendant, Lee Anderson. That said sale was evidenced by a contract in writing. That the deed to said property was to be delivered to said Anderson about October 1, 1921. That defendant Turbeville was not known in and was not a party to said deal. That some time after October 1, 1921, at the request of the said Lee Anderson, Webb in good faith executed a deed to said property to the said Turbeville. That said transaction with said Anderson was made in good faith, and he was informed and believed that the sale between Anderson and Turbeville was likewise in good faith. That no fraud or collusion was entered into by defendant in any way, and the sale to Anderson was in good faith and without any purpose or intention of defrauding any one; and that plaintiff had nothing to do with and was not concerned in the sale to Anderson. That the deed from Webb to Turbeville was made at the request of Anderson, he representing that he had sold said property between the time he had purchased the same from Webb on August 30, 1921, and the time of the delivery of the deed, on October 1, thereafter, and that Webb made the deed to Turbeville as a matter of convenience and accommodation to said Anderson. He further pleaded that if there had been any collusion or fraud practiced in the deal, it was without his knowledge or consent, and if said Anderson and Turbeville were interested together in the original purchase of said land or conspired against plaintiff, it was without the knowledge or consent of defendant Webb, and if said defendant was in any way liable to plaintiff for any commission, that he should have a like judgment over against his codefendants for any sums of money recovered against him. That he reduced the price of the land from $15 to $13.50 an acre, and had he known that he would have been liable to plaintiff for commissions he would not have reduced the price.

The defendants Lee Anderson and J. H. Turbeville likewise filed answers to plaintiff's petition, and defendant Turbeville filed a cross-action against Webb for any recovery had against him.

The cause was tried before the court, without the intervention of a jury, and judgment was rendered for plaintiff against defendant Webb for $2,000, and judgment given for defendant Webb over against defendant Anderson for a like amount, and judgment given for defendant Turbeville. From

this judgment the defendants Webb and Anderson have appealed, and have filed separate briefs in this court.

It is urged by appellant Webb that the evidence is entirely insufficient to show any liability on his part for the commission claimed by appellee. Plaintiff testified that he lived in Wichita Falls and was acquainted with defendant Webb, and that some time in April or May, 1921, he had a talk with him with reference to the sale of this land; that he told Webb that he thought he had a man that he could sell the land to, and that the man he had in view was Met Chenault; that Webb asked $15 an acre, and agreed to pay him $2,000 commission; that later he interested Mr. Turbeville in this matter and took him out to see the land, and subsequently Mr. Webb and Mr. Turbeville met on the ranch and had a long talk with reference to the trade; that plaintiff told Mr. Webb:

"If you have any better price, I think Mr. Turbeville is going to buy either the Anderson ranch or your ranch, one or the other, and if you have any better price than $15 you had better give it to me."

Mr. Webb said:

"I haven't got any better price; I would keep it before I would sell it for less."

He further said:

"I would rather see Anderson sell his ranch to Turbeville than to sell this one to him myself."

He said he would hate to see plaintiff lose his commission, but he would rather see Anderson sell his ranch than for him (Webb) to sell. He thought the notes would be good with Turbeville and Cowan on them. Plaintiff testified that this conversation occurred in the latter part of June or first of July; that the next thing he heard with reference to this land and the Turbeville deal was that Turbeville had bought the Anderson land; that he then requested Webb to give him a 10 days' option, but Webb said:

"I will tell you what I will do. There are other people that want to buy it, and before I do sell it I will call you over the 'phone and give you a day or two."

That Webb never did call him over the 'phone before the Webb deed was made to the land to Turbeville; that after Turbeville bought the Anderson ranch, he said there might something work out so that he could buy the Webb ranch; that he did not tell plaintiff that he would take it.

Webb testified: That he had listed the land with plaintiff at $15 an acre, and that plaintiff told him that he thought he could sell it to Turbeville, and he told plaintiff to go ahead and sell it to him at $15 an acre, and he agreed to pay plaintiff $2,000 commission if he made the sale. That he went out on the ranch one time to meet Hardy and Turbeville, but no sale was made, and the next thing he heard was that Turbeville had bought the Anderson ranch. That later Hardy asked him to give him an exclusive agency for ten days, but he would not give him the exclusive agency, but told him "if you want to get on this sale you call me up and I will give you two or three days to sell it." "I said, there are other people in this, and I want you to get the sale. You call me up and I will give you a little time to work it up." That this was the last time he heard from Hardy. That later Lee Anderson came to him and offered him $13.50 an acre for the land, and that he accepted said offer and entered into a contract of sale with Anderson. That Anderson gave his note for $5,000 to bind the deal. That the terms of sale were that Anderson was to pay $15,000, including the $5,000 note, by October 1st, to assume an indebtedness of $70,000, and the balance in ten equal payments, payable annually with the usual vendor's lien retained. That he sent the abstracts for examination to lawyers designated by Anderson, and on October 1st, met Mr. Anderson in company with Mr. Turbeville at Fort Worth. That Anderson told him he had sold the land to Turbeville, and asked if he would make the deed direct to Turbeville and avoid the making of so many deeds. That he consented, but required the deal to be closed that day, although the attorneys had not yet made a report on the title. That Turbeville wanted to delay closing the deal, but finally agreed to pay the $15,000 cash, saying:

"All right, I will pay the $15,000, and we will let my attorneys examine the abstracts, and after the trade is finished, we will take the papers and make the note bear interest from October 1st and close it up just to me."

That he thought it was probably October 30th before the deal was finally closed. He further testified that at the time Mr. Anderson executed the $5,000 note he probably owed him (Webb) $5,000. He testified in regard to this matter:

"On the day that Mr. Anderson executed to me this $5,000 note, he probably owed me $5,000. It is not a fact that he owed me $10,000, and that I had been trying for some time to get it and had been trying to get busy trading it out. It is not a fact. I think he owed me just $5,000. As to whether he offered to pay it, he had not paid it up to that time. He had not paid me a five-cent piece up to the time that he made this contract. I do not know that he did not have the money to pay it. As to my just telling the court that I needed the money and could not wait, will say that I do not know whether he had the money. I do not know that he could not because he didn't have it. I do not know that he had no $5,000 because I was taking his note because he didn't have the money to pay anything down on this big deal of 10,600 acres at $13.50 an acre. I agreed to take his note. It is a fact that I did not know that Turbeville

was paying Anderson $2,000 to buy that land of me for him. I never heard of it. I think it was right around the first of October I knew that Turbeville was going to take this land. I remember it was the day we went over there. * * * I didn't presume Turbeville had any interest in it until I made him that deed, and he asked me to make this deed to him. The date of the contract was the 30th of August. * * * Replying to your question to the effect that the contract was dated the 30th of August, and provides that Mr. Anderson was to have this land for $70,-000, and that he was to pay $15,000 cash and 8 per cent. on the balance, and as to whether or not Mr. Anderson paid me the $15,000 within the 30 days, will say that Mr. Turbeville did. Mr. Anderson did not pay me the $15,-000 in 30 days. As to whether I know that if Mr. Turbeville had not bought the land that he [Anderson] could not have paid for it, will say that in my trade with him he could. That was the trade. Mr. Anderson was to get me some of Mr. Turbeville's notes. That was the agreement I had with him. * * * I know that Mr. Anderson did sell the ranch to Mr. Turbeville.

"Replying to your request that I explain to the court how Mr. Anderson agreed to pay that $15,000, will say I had sold Mr. Anderson this same land that he sold to Mr. Turbeville, and I was holding notes against the land which Anderson sold to Turbeville, and I knew that the price that Mr. Anderson got from Turbeville would give him ample money to take care of the transaction with me, so far as I knew. I didn't know anything about the outside debts or anything of that kind. * * * The land was never priced at less than $15 an acre until the very minute it was sold. I did not reduce that price in order to beat anybody, especially this plaintiff, out of any amount of commission. I had no way in the world to know, nor did I have any reason to believe when I made that deal with Mr. Anderson, that Mr. Turbeville was interested in it. I asked Mr. Anderson the question. It was about 90 days before that since the last I had heard of any effort of this plaintiff to sell this land. Replying to your inquiry as to whether you asked me this morning as to whether or not Mr. Anderson was present the 1st of October at the time I first heard that Mr. Turbeville was interested in the land, will say all three of us were together. We were together in the hotel. All three of us were together when he wrote the check. Mr. Turbeville did not make any claim to me that he was interested in the land from the beginning. * * * Replying to your inquiry as to how I came to ask Anderson if he was buying it for himself and if I was suspicious of him, will say I don't know that I was. I have no reason to tell you why or anything. We were talking, and I asked the question. I don't know whether I had any object in view, but I remember asking the question. Yes, I believed him. Replying to your inquiry as to how I came to ask him when the transaction was over if Turbeville was interested, will say I think you have it a little wrong. I think I mean one thing and you another. * * * As to whether I was not satisfied when he told me that he was buying for himself and had to go further and ask if Turbeville was interested, will say I don't think so. The deed was made to Turbeville. I think the only question was if he was buying for Turbeville. As to your inquiry if I don't remember distinctly now asking him if he were buying it for himself, I say that is the same thing. As to your inquiry as to whether I put it both ways, asked him if he was buying it for himself, and, second, if he was buying for Turbeville, I say I don't know how it happened. I remember asking him the question. As to your inquiry as to whether I know that it happened that way because Mr. Anderson said so, and that when I made the deed to Turbeville that reminded me of the fact that I had asked if Turbeville was interested, and that I knew that was the man that Dan Hardy had showed the land to, and if I didn't think of these two things, will say I didn't think anything about it."

J. H. Turbeville testified, in part: That he and Anderson discussed the matter of buying the Webb land. That Anderson came to his house early one morning and told him that he could buy the Webb land for $13.50 an acre. That he asked the witness if he could handle it, and the witness replied: "I don't know whether I can or not." Anderson said: "I believe it is worth the money." And witness replied: "I guess it is, if I can pay for it." He further stated: That his stepdaughter had some money, inferring that he could get the money from her. That he thought that if they could buy the land, they could sell it and he and Anderson could divide the profits. That if he could get the money he would take it off of Anderson's hands and allow him a $2,000 commission, if it could be bought for $13.50. That Anderson told him that he could buy the land for that price and that he had a telegram from Mr. Webb to that effect. That he could buy the land as cheap as anybody. Witness told him, "Go ahead and we can handle it some way, if we can get the money." He further testified:

"Before Mr. Anderson went to Mr. Webb about buying the land, he came to see if I would be able to handle it. He said he could buy it as cheap as anybody. Replying to your question asking if I ever told him to go ahead and buy it and if I couldn't buy it I would see if I could sell it, will say that I said, sell it if we could. If we couldn't I would try to handle it. * * * The first one to take this sale of this land up with me was Mr. Hardy. Nobody was the first man that discussed the sale of this land with me except Dan Hardy until Mr. Anderson came and made me that proposition. Just Hardy. I do not remember the day that I and Mr. Hardy and Mr. Webb met out there on this land. I remember the occasion of our meeting out there. On that day I met Mr. Hardy at the ranch, or at Dundee, or somewhere. I believe we met at Dundee and met Mr. Webb out there in that valley country somewhere. I had an arrangement with Mr. Hardy to meet me out there that day. He called up and said Mr. Webb would

be there. When this deed was made to me, Mr. Anderson did not put up any part of the consideration that was paid to Mr. Webb that day on the $15,000. Mr. Anderson did not put up any part of that money. As to whether he has ever put up one cent of the consideration that was paid for that land to Mr. Webb, will say that I don't know anything about that. I have paid Mr. Anderson the $2,000 for getting this land from Mr. Webb for me. I mean I paid him the $2,000 on the deal. * * * I did not buy it through Mr. Hardy. As to whether I had dismissed it from mind, the proposition of buying it until Mr. Anderson came to me, will say I wouldn't pay $15 for it. I would not pay $15 for it. I was not figuring on buying it at $15. As to whether I was figuring on buying it at all until Mr. Anderson came to me, will say that I don't know whether I had thought about it or not. As to whether I had dismissed it from my mind or had abandoned all attempt to buy it, will say I just thought it would take $15. I don't know that I had thought about it. I was not still trying to buy the land. * * * I was not trying to buy the land till Mr. Anderson came to me. I said that Mr. Webb was there at the ranch and Mr. Hardy was with him. Or that he met me and Mr. Hardy out there. I did not make any attempt after that to buy the land. * * * Only discussed it with Mr. Hardy. He kept trying to sell it to me. All the time I told him I couldn't buy it. I didn't decline to buy from Hardy. I don't know that I declined. * * * I don't know anything about it. I didn't want it at $15. * * * It is a fact that Mr. Anderson came to me and told me that he had heard that Mr. Webb would take $13.50 for the land. Mr. Gibbs told me. It is not a further fact that he went down there and purchased it and came back and told me that he had purchased it. He said he bought it for himself. He told me that. * * *

"As to when is the first time I said anything to him (Webb) about making the deed to me, will say I don't know anything about that, the first time. It was in the conversation that we would take the deed. That I was going to take it. He was not to be interested with me. If we could sell it, we would cut the money. I mean that if I should get $14,000 that would be cut in two, but if we couldn't I was to take it over and allow him a $2,000 commission. * * * I suppose I would have bought this land from Mr. Hardy at $13.50 an acre, like I did from Mr. Anderson from Mr. Webb. * * * I had bought Mr. Anderson's ranch before that. I owed him something on that ranch that I bought from him; I don't remember how much. Replying to your question asking if I can give you in the neighborhood of it, of the whole business against the ranch, will say the whole business against the ranch was $248,000. * * * Of that there was about $62,000 due to Mr. Anderson, I think. There was a little more than that coming to Mr. Anderson. I think it was about $71,000. * * * It is not a fact that Mr. Anderson approached me and told me that he could buy this 10,000 acres of Mr. Webb at $13.50 an acre, and that he couldn't handle it unless I could pay him some, and asked if I could pay him $16,000

then, that much on the indebtedness that I owed him. Replying to your question asking if he didn't tell me that he thought he could handle this proposition through Ben Loper at $16 an acre, and if I would advance the $16,000 on what I owed him to help make the deal that he would give me half the profits that was made between the $13.50 and $16, will say I don't think that is the way we talked. We were going to split the money if we could sell it, but I wasn't going to advance him to make the trade. It was not the consideration for me to advance him on his own so that he could make the contract with Mr. Webb. Replying to your inquiry as to whom Kay & Aiken were examining the titles for, whether for myself or Mr. Anderson, will say he came back and told me that he bought the land from Sid Webb and had had the abstract sent to Kay & Aiken, and I could go ahead and let them examine it, or I could let some one else examine it; that he thought I wanted it sent to Kay & Aiken. Or I could let somebody else examine it."

Anderson testified: That one day he was in Seymour and met Mr. William Gibbs on the street, who told him that Mr. Webb had offered the land for $13.50 an acre, and he believed it could be bought for a little less. That the contract of purchase was made August 30th. That he mentioned to Mr. Turbeville with reference to buying the land for him, and mentioned to Turbeville to see whether he wanted the land for himself or not. That he had bought the land of Webb and he wanted to see if Turbeville wanted it. If Turbeville did not want the Webb land, he wanted to buy it for himself. That Turbeville told him he would like to have the land, and he told Turbeville that he thought he could sell the land to Ben Loper. That Turbeville told him that if they could buy the land they would split the profits. That after Turbeville told him this he was intending to buy the land for both Turbeville and himself. That if Turbeville did not want the land he intended to buy it for himself. That Turbeville told him that his wife's daughter had some money that he thought he could get. That the witness mentioned the matter of getting some of the land notes from Turbeville to him cashed, and Turbeville told him that his wife's daughter had some money. That it was understood, before he went down to Mineral Wells to see Mr. Webb, that either he and Turbeville would buy the land, or that one of them would buy it. That there was never any collusion between him and Turbeville to beat Mr. Hardy out of a commission or to stick Mr. Webb for a commission. That as to Webb asking him whether he was buying the land for Turbeville or not, that Webb did ask him if he was buying the land for himself and he told him that he was. That at the time of this deal Turbeville owed him land notes amounting to $62,000 or $63,000. That he expected to get the money, if he should have to buy

the land himself, from Turbeville to make the cash payment. Evidently, this testimony, upon which appellee relies to show that Anderson was not financially able himself to buy the land, merely means that he expected Turbeville to pay him the $15,000 on the land notes, which he held at that time.

Anderson further testified:

"Answering your question as to when Mr. Webb did ask me if I was buying the land for Turbeville, will say I think it was probably when we closed up the deal—that same day, after we got down there and made the contract, after we left the place. Before the deed was expected he asked me that. He might have had in mind the fact as to whether or not Turbeville was the fellow that was taking this land, because he asked me that question. I don't know what he had in mind. As to your question asking if it was there after I made this contract that I am offering in evidence that Mr. Webb asked if I was buying it for Turbeville, will say I think it was the same day. Before the contract was made I told him I was buying it for himself. Replying to your inquiry asking if he wasn't satisfied with that, and on the same day he asked me if I was buying it for Turbeville, and to the court's inquiry as to what my answer was when he asked me if I was buying it for Turbeville, will say I told him I was not. Both inquiries happened on the same day. Answering your inquiry if I told the court that I didn't go down to see Mr. Turbeville before I went down first to make the contract and told him that I could buy it for $13.50 an acre, and he told me to go ahead ,and if we could sell it we would split the profits and if we didn't he would handle it, will say 'No, sir; he didn't say—he didn't say if we couldn't sell it that he would handle it.' "

. Mr. Hardy testified, having been recalled, that—

"As to your inquiry as to whether he [Webb] authorized me to sell it for any less, will say I asked him for a better price and he refused to give a better price. He said he wouldn't give me a better price. The best price that he would give me was $15 an acre, but you understand it wouldn't make anything about what I was going to get for the land. I was to get $2,000 if I sold the land. I asked him if he had any better price to give it to me. And he refused to give me a better price. He would keep it and sell it for himself. * * * Replying to your question as to whether any other price than $15 an acre was mentioned between me and Mr. Webb at any time, will say before that I think Mr. Webb made me that land at $16 when I was showing it to Mr. Chenault."

On being recalled as a witness, Mr. Webb testified that—

"The land was never priced at less than $15 an acre until the very minute it was sold. I did not reduce that price in order to beat anybody, especially this plaintiff, out of any commission. I had no way of knowing, nor had any reason to believe when I made that deal with Mr. Anderson, that Mr. Turbeville

was interested in it. I asked Mr. Anderson the ·question. It was about 90 days before that since the last I had heard of any effort of this plaintiff to sell this land. * * * Replying to your inquiry as to how I came to ask Anderson if he was buying it for himself and if I was suspicious of him, will say I don't know that I was. I have no reason to tell you why or anything. We were talking, and I asked the question. I don't know whether I had any object in view, but I remember asking the question. Yes, I believed him."

[1] We recognize the rule as held in Webb v. Harding (Tex. Civ. App.) 159 S. W. 1029, and as affirmed by the Supreme Court in 211 S. W. 927, and in Goodwin v. Gunter, 109 Tex. 56, 185 S. W. 295, 195 S. W. 848, and Pierce v. Nichols, 50 Tex. Civ. App. 443, 110 S. W. 206, that where owners of land secure brokers to look up purchasers at a given price, and the owner subsequently sells the land to the purchaser at a reduced price, thereby utilizing the purchaser secured by the efforts of the broker, the broker is entitled to his commission. As is said in Keys v. Johnson, 68 Pa. 42, cited in Pierce v. Nichols, supra:

"A broker becomes entitled to his commissions whenever he procures for his principal a party with whom he is satisfied, and who actually contracts for the purchase of the property at a price acceptable to the owner. * * * He must establish his employment as a broker, either by previous authority, or by the acceptance of his agency and the adoption of his acts,. and also must prove that his agency was the procuring cause of the sale; and when, being duly authorized to sell property at private sale, he has commenced a negotiation with the purchaser, the owner cannot, while such negotiation is pending, take it into his own hands and complete it either at or below the price first limited, and then refuse to pay the commissions."

But we do not believe that there is any substantial evidence in the record to sustain the conclusion in this case that such facts are shown. So far as the evidence shows, at the time Anderson came to Webb and offered to buy, and did enter into a contract to purchase, the land, Webb did not know that Anderson was representing the purchaser who had become interested in the land through the efforts of Hardy. Even though Anderson and Turbeville agreed to buy the land together, or even though before the deal was consummated Anderson did agree to sell the land to Turbeville, or to ask Webb to make the deed directly to Turbeville, yet, before Webb would be liable to Hardy for any commission, he would have to know before he made the contract of sale with Anderson that in fact Turbeville and not Anderson was to be the purchaser. Hardy had no exclusive agency to sell the land, and Anderson or any other person or agent had the right to sell the land under terms mutually agreeable to Webb and the purchaser. We

think the evidence entirely fails to show that at the time Anderson and Webb entered into the contract the latter knew or had any reason to suspect that Turbeville was in fact to be the purchaser.

[2, 3] While we fully recognize and accept the rule that a judgment must not be reversed on facts where there is any substantial evidence to support it, yet we also recognize the rule, established by abundance of authority, that a judgment which rests upon mere speculation or surmise or suspicion ought not to be allowed to stand. We think this case comes within that class, and that the judgment of the trial court for plaintiff against defendant Webb should be reversed, and it appearing that the facts have been fully developed, we here render judgment for appellant, and so order.

[4] We know of no rule allowing one of two persons alleged to have been guilty of fraud against a plaintiff to recover against the other. We think undoubtedly the judgment of Webb over against Anderson should be reversed and here rendered for Anderson.

The judgment below as to appellant Webb is reversed and here rendered, as also the judgment of Webb against Anderson.