### TRAVELERS INS. CO. v. CARTER et al.

#### No. 13352.

Court of Civil Appeals of Texas. Fort Worth.

April 24, 1936.

Rehearing Denied June 12, 1936.

Thompson, Knight, Baker & Harris and Pinkney Grissom, all of Dallas, for appellant.

Clark & Clark, of Fort Worth, for appellees.

BROWN, Justice.

This is a workmen's compensation suit. Judgment was entered for the claimants.

Appellee Emzie Carter, surviving husband of Vera Carter, brought suit for himself and his three minor children against appellant, who was an insurance carrier, alleging, in substance, that Vera Carter was a maid employed at the Texas Hotel at Fort Worth, and that on or about the 11th day of August, 1933, while engaged in the work for which she was employed, she sustained an accidental injury; that she was overheated and exhausted as the result of the laborious and strenuous duties exacted of her and under conditions which were unfavorable for her labor, namely, excessive heat and humidity; that she became faint and exhausted, but in spite of her condition, continued to work for her employer a few days longer, although she should have been permitted to remain at home and rest; that she became wholly incapacitated to work and was confined to her home, continued to grow worse until about September 16, 1933, when she died.

It was alleged that Vera Carter was forced to do heavy lifting and straining work and was forced to carry bedding, linens, supplies, machines, tools, and apparatus with which she worked, from one room to another and up and down stairs in the hotel, and had to lift and move heavy furniture, and that about the time of her injury the atmosphere in which she was compelled to work was unusually hot, and on account of the heavy work, strain, heat, and conditions and surroundings in which she was compelled to work, she sustained a ruptured blood vessel, or vessels, in her brain and head, which resulted in her death.

We do not need to notice any other allegation, as the cause was tried in the light of the pleading just summarized.

The cause was tried to a jury. The trial court gave the usual definition of "injury" and defined "accident" as "an unlooked for and untoward event, which is unexpected and not designed."

On the issues submitted, the jury found, in substance: (1) That on or about the 11th day of August, 1933, Vera Carter received an injury to the blood vessels of her brain; (2) that the injury "was an accident"; (3) that the injury was sustained in the course of her employment; (4)

that Vera Carter's death was the result of the injury; (7) that manifest hardship and injustice would not result to the plaintiffs if a lump-sum judgment were not awarded; (8) that manifest hardship and injustice would result to the plaintiffs if they are paid at the rate of not more than $7 per week; (9) that the amount of compensation per week that would be just and fair for the plaintiffs to receive is $14.

The insurance carrier requested a peremptory instruction, which was refused; requested a charge asking the jury to find whether or not Vera Carter's death was due solely to causes not arising in her employment, and a special charge asking the jury to find whether or not Vera Carter's death was due solely to the hardening of her arteries; and a special charge asking the jury to find whether or not Vera Carter's death was caused solely by syphilis; and a similar charge governing the issue of death caused solely by an infection in the blood stream. All of these requested issues and charges were refused.

Many objections were directed against the court's charge, and many assignments of error are submitted; but taking the view that we do of this case, we do not see the necessity of reviewing all of the assignments of error.

It is insisted that appellant should have been given the benefit of a peremptory instruction in the trial court, because there is no evidence in the record to raise the issue of an accidental injury sustained by Vera Carter while engaged in her labors as an employee of the Texas Hotel. We believe the assignment of error is well taken.

It is undisputed that Vera Carter was not called upon to do, and did not perform, any service or labor that was not usually and customarily performed by all other employees of her class, and it is likewise undisputed that she was subjected only to the same character of atmospheric conditions and surroundings as were all other employees in her class. There is no testimony in the record disclosing that Vera Carter did any unusual thing while she was working on or about August 11, 1933, and none that she sustained any character of injury or that any accident happened to her. The testimony of those who were with her and saw her on that day, and on subsequent days, only tends to show that she complained of a headache which

coursed down her neck, arm, side, and leg, and that she appeared worn and exhausted.

The theory of the case is that Vera Carter ruptured a blood vessel while she was working and died from a cerebral hemorrhage. No autopsy was held, and all the evidence adduced by which this issue is raised comes from one physician (Dr. Rhodes) who never saw her but whose testimony is based solely upon hypothetical questions, and the attending physician (Dr. Ransom) who based his statements on what he termed "presumptive diagnosis."

The only testimony given by Dr. Rhodes, which tends to raise the issue of whether or not the deceased suffered a cerebral hemorrhage, is as follows:

"Q. Doctor, assuming that a negro woman, about 27 or 28 years old, in apparently good health up to the time that she was working in a hotel, which required her to move heavy furniture and mattresses and carry heavy loads of linen, say, weighing from fifty to seventy-five pounds, and assuming that after doing this work and this lifting she complains of a pain in her head and down her back and her arm and leg and stops and sits down or lies down, and that she attempts to continue working several days and finally quits and during all of that time whenever she lifts she complains of pains in her head and down her back and leg and is finally confined to her bed and vomits and does not have the use of her leg or arm, that is, does not have the free use of the arm or leg, and within three or four weeks she dies; assuming those facts to be true, what would you say was the cause of her death? A. It is possible that she had a cerebral hemorrhage.

"Q. State whether or not the cerebral hemorrhage may be caused from heavy exertion and lifting? A. It certainly can.

"Q. Assuming that a person was in apparent good health and had not suffered with any pain in her head or with any of the symptoms that I have detailed, until after she did the lifting, state whether or not in your opinion the lifting and exertion would be the cause of the cerebral hemorrhage? A. Yes."

This is the direct testimony of the witness who never saw Vera Carter.

On cross-examination, the witness testified that a cerebral hemorrhage or apoplexy is caused by a number of things, and that very often it is difficult, if not impossible, to tell, under any state of facts, what ac-

tually caused it; that in this case he does not know what actually happened and never saw the patient.

The following questions and answers on cross-examination appear:

"Q. And all you say is and your testimony is as I understand it, that it was a possibility? A. Certainly.

"Q. And not knowing all of the facts, you would not even know anything about it, except that it was a possibility? A. Yes, sir."

He testified that among the causes of cerebral hemorrhage is arteriosclerosis or hardening of the arteries, and diseases of various kinds may cause apoplexy; that there are about three diseases which produce high blood pressure. He then testified as follows:

"Q. So, in your opinion, although this condition that has been detailed to you here could have been produced by these things that were detailed to you here, there are probably lots of other things that could possibly cause it? A. Certainly. It could have been an initiative cause, don't you see, with the other disease you spoke of.

"Q. What are these diseases you say pretty generally produce high blood pressure? A. Well, thyroidism, kidney condition, and arteriosclerosis are the three main conditions that produce high blood pressure.

"Q. And in order to determine just what killed this woman, there would have to be an autopsy? A. Absolutely.

"Q. And if there was no autopsy, it would be more or less guess-work, in any event? A. Yes, sir."

The attending physician, Dr. Ransom, testified as follows:

"That he is a physician and surgeon and has been practicing medicine for 26 years; that his practice is confined to the colored population; that he knew Vera Carter and had occasion to treat her during her lifetime, and that she had been a patient in his hospital and was at the time of her death. His diagnosis as to the cause of her death was hermorrhage of the brain. Some patients die immediately from a cerebral hemorrhage and some live to suffer the second or third attack.

"Q. What are the symptoms of a person having a cerebral hemorrhage? A. Well, the principal symptoms of a cerebral hemorrhage is a headache and dizziness, as a forerunner, and the patient usually goes out very abruptly, loses consciousness and many times they may have convulsions or twitchings of the muscles in the body and they may have a twisted condition of the eyes and the face, followed with some type of paralysis, and usually the paralysis begins in the face and spreads to the extremities.

"Vera Carter died September 16, 1933. Heavy lifting and exertion would be considered as an exciting cause of hemorrhage of the brain. We usually have two causes of most conditions, the predisposing cause and the exciting cause. It would be difficult to presume that she was in good health. Being in good health and being in apparent good health are two different things. We cannot be positive that Vera Carter was in good health. Any type of straining, emotion or excitement will have a tendency to bring on a cerebral hemorrhage if one is predisposed to it."

On cross-examination, this witness testified substantially as follows:

"That if Vera Carter had ever had any symptoms of convulsions and twitchings of muscles, the most apparent symptoms of cerebral hemorrhage, they had already passed and they were not present at that time and he never saw them, and they had all passed at the time he first saw her, and he does not know whether she had ever had them or not. Dr. Ransom had seen her before she ever broke down with the stroke. She went by his office but he does not know what date. This must have been three or four days before she had the stroke. He does not know what date she had the stroke, but he saw her on the 23rd of August at the hospital. That was the first time he had seen her after she had gone to bed, but he had seen her before she went to bed. He must have seen her three or four days before she had the stroke, and she was complaining of headache at that time. He gave her some medicine and told her to go home and go to bed. The doctor did not know whether it was before August 18th or after August 18th when he first saw her. That Vera Carter had not had any apoplexy when he first saw her; that when he first saw her she was suffering with a severe headache. The severe headache might be considered as a symptom of a slight hemorrhage, but of course people have headaches from various causes.

"Q. Of course, what brought on the hemorrhage or the stroke that you have

been speaking of, you don't know? A. No, sir, I would not know; I haven't attempted to say.

"Q. And you would not attempt to say; all that you know is that you found the symptoms there and she died? A. Yes, sir.

"Q. As matter of fact, it would be more or less guess work as to what was the cause of her death without an autopsy, wouldn't it? A. Well, the diagnosis would be presumptive.

"Q. As a matter of fact, we have quite a number of causes of cerebral hemorrhage or apoplexy, don't we? The doctors know of a number of causes for it, don't they? A. Sure.

"The predisposing causes of apoplexy would be hardening of the arteries, kidney trouble, blood trouble, arteriosclerosis, syphilis,—hardening of the arteries and syphilis, kidney trouble and thrombosis or the blocking of a blood vessel. Thrombosis could be caused from various kinds of infection such as one sticking an infected nail in their foot.

"Q. If one had bad tonsils and lots of pus in the tonsils, trouble. like that, can that throw poisons into the blood stream to where a thrombosis might develop? A. Yes, sir.

"Q. There are so many different causes for hemorrhage of the brain that a doctor can do very little more, if anything, than just to speculate as to what the diagnosis should be. A. The diagnosis is absolutely presumptive, unless an autopsy is held and you open the skull and look down there and see for yourself; otherwise it is presumptive.

"Q. It is possible, and in a sense as plausible as another, that if you can pick out in one's life one particular thing which could have caused the hemorrhage, that it is just as likely that something else may have caused the hemorrhage as the thing you can pick out? A. I am not attempting to pick out anything.

"Q. But what I am saying, that is a fact, that if you pick out one thing in one's life which could produce the hemorrhage, that you wouldn't want to say for sure in your opinion whether that produced it or whether something else produced it? A. No, sir, not positively, not positively.

"Q. Because you are getting wholly in the realm of speculation? A. That is true. Let's go a little further and we will clear that up, while we are discussing the predisposing causes; now, then we have certain exciting causes. Now the condition is there, and nobody knows how it was laid—

"Q. And you may not know that it is there? A. And you may not know that it is there, but any form of excitement, it matters not whether it is work, or overjoy, or sexual intercourse or anything that will bring on unusual excitement or straining of the person's body ·is likely to quicken the circulation and throw a heavy quantity of blood to the defective blood vessel and cause it to break down.

"Q. Now, if you don't know—if there is no way to tell whether there is a predisposing cause, then it would be impossible to tell that anyone of the exciting causes that we usually know about—we couldn't tell whether that produced the hemorrhage or whether they died of something else; that is true, isn't it? A. You mean whether or not that produced—

"Q. Suppose you didn't know of a predisposing cause—headache in this case, and every bit of the evidence shows that she was in perfect health—absolute perfect health—if you didn't know of any predisposing cause, before you can arrive at the fact that there was an exciting cause which set off the predisposing cause and caused the hemorrhage, you have first got to assume that there was a predisposing cause, do you not? A. The only thing that the doctor has to go by in this case would be just the symptoms he actually found, from which the patient would be suffering.

"Q. And you would have to admit and any other good doctor would have to admit when you do that, you are doing nothing but speculating in a way? A. I have said that; presumptive diagnosis.

"Q. And that is what you mean by presumptive diagnosis? A. Yes, sir.

"Q. And all you can say about this is, it is possible that this was a cerebral hemorrhage brought on by some character of excitement? A. Sure.

"Q. Or straining? A. That is all I would attempt to say.

"Q. That is all you mean to say? A. Yes, sir."

The proof showed that the deceased was 27 years of age. For the purpose of testing the right of appellant to a peremptory instruction, we refrain from quoting from the physicians who testified for appellant. It is apparent that the testimony of the

physicians, which is relied on by appellee, to raise the issue on which this cause was tried, amounts to no more than speculation and guesswork. We do not find in the record any visible evidence of an injury to the employee's blood vessels in her brain, and this appears to be a case where expert medical testimony is necessary to raise the issue. We do not believe that the testimony of either, or both, of these physicians is sufficient to raise the issue.

The judgment of the trial court is reversed, and judgment is here rendered for the appellant. Article 8306, §§ 3b, 8, 8a; article 8309; Texas Employers' Insurance Assn. v. Herring (Tex.Civ.App.) 269 S. W. 249; Id. (Tex.Com.App.) 280 S.W. 740; Southern Casualty Co. v. Flores (Tex.Com.App.) 1 S.W.(2d) 260; Fidelity Union Casualty Co. v. Martin (Tex.Civ. App.) 45 S.W.(2d) 682; Allen v. Republic Building Co. (Tex.Civ.App.) 84 S.W.(2d) 506; Webb v. Hardy (Tex.Civ.App.) 269 S.W. 243; Galveston, H. & S. A. Ry. Co. v. Powers, 101 Tex. 161, 105 S.W. 491; 19 Tex.Jur. p. 36, § 16.

Reversed and rendered.