## TEXAS EMPLOYERS' INS. ASS'N v. HERRING.　(No. 10674.)

(Court of Civil Appeals of Texas. Fort Worth. May 17, 1924. Rehearing Denied Oct. 18, 1924. Writ of Error Granted Dec. 20, 1924.)

1. **Master and servant** &xrightarrow{} 417(5)—**Evidence of death from injury in employment held sufficient for jury.**

Evidence that oil driller died from injury received in course of employment causing traumatic appendicitis *held* sufficient to go to jury.

2. **Master and servant** &xrightarrow{} 405(4)—**Claimant required to prove compensable injury by showing circumstances.**

Claimant must prove whether decedent was injured in course of his employment by showing circumstances of injury where no one was present at time of injury, and claimant and physician were precluded from testifying as to decedent's declaration as to cause of injury.

3. **Master and servant** &xrightarrow{} 417(5)—**Evidence held to warrant submission to jury of issue of lump sum award.**

Evidence *held* to warrant submission to jury of issue whether failure to pay lump sum award to decedent's widow would cause manifest hardship and injury, within Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—33).

4. **New trial** &xrightarrow{} 99—**New trial on ground of newly discovered evidence held properly refused.**

New trial on ground of newly discovered evidence was properly refused, where new testimony was cumulative and there was no showing of diligence or excuse why it was not introduced at trial.

5. **Appeal and error** &xrightarrow{} 231(1)—**Objection to argument as whole, part of which was justified by evidence, could not be considered on appeal.**

Objection to argument of counsel, part of which was justified by evidence, without calling trial court's attention to objectionable part, could not be considered on appeal.

Appeal from District Court, Stephens County; C. O. Hamlin, Judge.

Suit by Elizabeth Herring against the Texas Employers' Insurance Association. Judgment for plaintiff, and defendant appeals. Affirmed.

Harry P. Lawther, of Dallas, for appellant.

Will R. Saunders and V. L. Shurtleff, both of Breckenridge, for appellee.

BUCK, J. Plaintiff below, Elizabeth Herring, brought this suit to set aside an award of the Industrial Accident Board and to recover compensation under the Texas Employers' Liability Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246–1 to 5246–91) on account of the death of her husband Charlie Gee Herring.

The cause was submitted to a jury on special issues, in answer to which the jury found (1) that Charlie Herring received an injury while in the course of his employment with M. B. Hale on or about the 19th day of July, 1922; (2) that said injury was the proximate cause of his death; and (3) that the failure to pay the amount of recovery in a lump sum would result in manifest hardship and injustice to petitioner. Article 5246—14, Rev. Civ. Statutes, limits the recovery in case of death to $15 a week for 360 weeks from the date of the injury. The court rendered judgment for petitioner for $4,577.35, being the present value of $5,400, payable $15 a week. The defendant has appealed.

[1] The appellant urges that the trial court erred in submitting the issue:

"Did Charlie Herring receive an injury while in the course of his employment with M. B. Hale on or about July 19, 1922?"

Neither plaintiff below nor the attending physician of the deceased, Dr. B. F. Edwards, was permitted to testify as to any statements made by the deceased to either of them as to how and when the deceased received the injury, if any, from which he died. It was evidently the view of the trial court that testimony as to any statements made by the deceased to his wife or to his attending physician as to how the injury, if any, was received, was hearsay, and there

seems to be considerable authority supporting that contention. Lumbermen's Reciprocal Association v. Adcock, 244 S. W. 645, by the Beaumont Court of Civil Appeals; Reck v. Whittlesberger, 181 Mich. 463, 148 N. W. 247, Ann. Cas. 1916C, 771. Appellee has no cross-assignment to this ruling, and hence we will not further consider it.

Mrs. Herring testified that she was the wife of Charlie Herring at the time of his death, and that they lived at Eliasville, Stephens county. That her husband's business was that of a driller, and that he was working for M. B. Hale, drilling a well about 15 miles north and east of Breckenridge. That they lived about three quarters of a mile from the well. That her husband was working from 12 noon to 12 midnight. That on July 19th, the day he was taken sick or injured, he was in his usual robust health; after he ate his breakfast she and her baby went with the deceased in a car to Eliasville, about four and a half miles from their home; there they bought some ice and groceries and returned home about 9:30 or 9:45 a. m. That she then prepared dinner. That her husband ate his usual breakfast and usual dinner that day. That he never made any complaint about feeling unwell. That in his general appearance he was strong and healthy, weighing about 217 or 220 pounds. That he was about five feet eight inches tall. That he had been working in Stephens county oil fields about three years, and the general condition of his health during that time was good. That he was making about $12 or $14 a day on July 19, 1922. That he left home about 20 minutes to 12 and the next time she saw him was about 2 or 3 o'clock. She further testified:

"The next time I saw him was when he drove up to the house in the car, and then he had his hand on his side and the other hand over the steering wheel in a cramping position. You ask me what his appearance was as to suffering pain when he drove up to the house. Yes, sir; he was suffering intense pain. After he drove up I helped him out of the car onto the porch. I got him that far, but could not get him in the house; that is the reason I did not take him in. All the time I was taking him out of the car and getting him as far as the porch he was suffering intensely; he never did take his hand off his side. When I got him on the porch I put some pillows around him and got some ice and wrapped it up in a cloth and put it on his side. I did not see his side when I put the ice on his side as I did not take his underwear off, but put it on top of his underwear. I sent for Dr. Edwards, and it was about a half hour or three quarters of an hour until Dr. Edwards came. When he came he helped him in the house and got him on the bed, and then gave him a hypodermic. Dr. Edwards made an examination of his side. I was present at the time and saw my husband's side. His side at that time was black and blue and swollen. Dr. Edwards made a thorough exam-

ination of him there. Dr. Edwards came again about 6 or a little after that afternoon. Dr. Edwards made a diagnosis of the trouble then, and said the best thing to do was to take him to a sanitarium for an operation, and suggested that Fort Worth would be a good place to take him. He said the reason he thought he should go to Fort Worth was that everything would be convenient and sanitary and he would have the best of care. Dr. Edwards referred me to Dr. McCollum in Fort Worth. I took Mr. Herring to Fort Worth.

"The day Mr. Herring came home from the well was on Wednesday, and we started to Fort Worth on Friday, the following Friday after he was hurt on Wednesday. We got to Fort Worth about 11 o'clock the next day, on Saturday. We took him from home to Breckenridge in an ambulance, and intended to catch the train from here to Fort Worth, but we missed the train. After we missed the train we put a bed in the back of a service car and took him to Fort Worth in the service car. It was a large Buick car. The bed was made straight out in the back by a mattress, and we had some pillows. I held him all the way to Fort Worth. When we arrived at Fort Worth we took Mr. Herring to the St. Joseph's Sanitarium. He was operated on that day by Dr. McCollum; that was Saturday evening. I remember the time Mr. Herring died, it was at 5 minutes to 5, Sunday evening, the following Sunday."

She further testified:

"I was present in Fort Worth at the time my husband was operated on and was in the operating room, and when he went on the operating table there was a blue place black and blue and swollen on my husband's side then. When my husband came home that afternoon from the well and I met him at the porch, he told me then he had suffered an injury. He also told Dr. Edwards at the time he was making the diagnosis what had happened to him."

Dr. Edwards testified that he was a graduate physician and knew the deceased about three or four years before his death. That he was the family physician and knew the deceased just like a physician would know people whose practice he did. That prior to Mr. Herring's last illness, in July, 1922, he did not recall ever having been called to see him professionally. That he might have given him a prescription or something like that, but made no professional visits to see him. That all of the professional visits to his home had been to see other members of the family. That on July 19th, probably between 2 and 3 o'clock, he was called to Mr. Herring's home, and found him on the gallery in a cramped position, propped up by some pillows. That the patient was suffering great pain when the witness got there. Mrs. Herring was with her husband at the time. That he gave him a hypodermic to ease his pain and undressed him and put him to bed. That he found considerable discoloration of the body in the right inguinal region. That from his diagnosis he

concluded that the deceased had received an injury to his right side in the inguinal region. That the appendix was ruptured and this rupture was produced by an injury, or traumatis received by Mr. Herring. That the conditions he found are sometimes called traumatic appendicitis; that his diagnosis was based upon objective symptoms of injuries found on Mr. Herring's side. That he was present when Mr. Herring was operated on at Fort Worth, and saw his body, and that the appendicital region was swollen and very sensitive to pain, and that the discoloration that he had testified to as being present when he first saw the patient was still present at the time of the operation. He further testified:

"As to my opinion as a physician as to the sole cause of Charlie Herring's death, Mr. Herring's death was caused by traumatism, producing a ruptured condition of the appendix which finally resulted in his death. My reason for thinking that traumatism received by Mr. Herring caused his death is that I do not believe his appendix would have been ruptured or at the time he would have been suffering as he was when I saw him, unless he had suffered a traumatism. My further reason is that the severe bruises and discolored condition in his right side showed that he must have received a very severe injury in that locality. I will say that I first found these evidences of injury to Mr. Herring's body that I have already described when I first examined him, and each and every time I saw him afterwards. The treatment I gave him was medicine to relieve the pain, and also advised an operation."

Otto Kidd testified:

"My name is Otto Kidd. I live near Eliasville on the J. W. Hill ranch. I am gauger for J. W. Hill. I knew Charlie Herring during his lifetime. He lived about three-quarters of a mile from me. I had known him about two years at the time of his death. I would see him most every day. You ask what was Mr. Herring's appearance with reference to being a strong, healthy, robust man, during the time I had known him. I had never known of him being sick; he was always at work. He was a driller, and that is about as heavy work as there is in the oil fields.

"You ask if I met Charlie Herring between my house and the well on which he was working, about the 19th of July, 1922. It was during the time he was working on the well on the Clow farm, or Gulf lease, I met him. I saw him when he went to his work and when he was returning. I should judge I saw him going to his work about 11:30, something like that, in a Ford car. You ask what his general appearance was at that time with reference to whether or not he appeared to be a healthy, robust, and strong man. He always seemed to be cheerful, when he would pass my place he would wave his hand and holler 'hello.' He had the appearance then of being healthy and robust. That was something like 11:30. Well, we ate dinner about 12, and I got in my car about 12:15 or later, between 12:15 and one. It was not but a short time after that I next saw

Charlie Herring, I met him about half a mile from where I live and about three fourths of a mile from the well on which he was working. He was in a car going toward his home. I had eaten my dinner and left for my duties of gauging, and it was between 12 and 1 o'clock I met him in the road. I was in my car and he was in another car and I wondered why he did not give me the road. The road was very narrow, and he had a chance to turn out, and it was really his place to do so. I wondered why he did not turn out. Mr. Herring would always greet me, or show that disposition when I met him; we were on the side of a hill, but he drove right up. I stopped my car and he stopped his and I said, what is the matter, Mr. Herring?"

Claude Campbell testified that he was a tool dresser, and was working for M. B. Hale at the same well on which the deceased was working just prior to his death. That he had known Herring about 10 days. That his duty as a tool dresser was to fire the boiler, keep up the engine, and other things. That on July 19th he and Charlie Herring went to work about 12 o'clock; that the derrick on the inside was about 22x36 feet; that it was muddy—mud on the floor; that the derrick stool is a stool upon which the driller mounts to get to the clamps and screws. It has three decks or steps; it is something like a little ladder, and is about five feet high. That the stool then and now in use was not in very good condition at that time. He further testified:

"I was not on the inside of the derrick all the time after I went to work at 12 o'clock on the 19th of July. I saw Charlie Herring after he went to work at noon that day. The last time I saw him he complained of being hurt there or his side hurting him. The last time I saw him before he complained of having hurt his side or his side hurting him he was on the first deck of the stool. The derrick stool is used so you can get up to the screw. The screw is what you let the tools down with. That day when we went to work the tools were in the hole—they were being run that day. The last time I saw him that day before he made these complaints he was on the first deck of the derrick stool. I did not go anywhere after that; I stayed there. I did not leave the rig after the last time I saw him standing there. The last time I saw him before he complained I went out to the boiler. The boiler must have been sixty or eighty feet from the derrick. I don't know what all I did out there, but I was looking things over to see that everything was in shape. I was out there somewhere around five or ten minues. The boiler was fired up, and there was considerable noise. Charlie Herring's general appearance as to being strong, healthy, robust, able-bodied man during the time I had known him seemed to be pretty good. When he went to work at noon on July 19th his condition was very good with reference to being strong, able bodied, and a healthy man. When I came back from the boiler and attending to my duties on the outside, I did not see any difference in his condition, immediately after I came back.

Charlie Herring did not say anything to me just then. He first said anything to me when we went to pull the tools out of the hole. That was shortly after I came back in. * * *

"I guess it was probably 12:15 or 12:10 or something along there when I got out to the boiler; I can't say just what time exactly. When I got back from the boiler it was something between 12:20 and 12:30. I believe as I came back he was on the stool, letting down the screw, as well as I remember. I never paid very much attention to what he was doing, it is his business, not mine. Anyway, he was working. A derrick stool is practically the same as a step ladder, just a stool with three steps on it. We call the steps decks. The decks are about a foot wide, I guess and not as long as that table, just room enough for a man to stand on, big enough for both feet. I think he was on the bottom step, and I suppose he was using his hands to turn the screw. It depends on where the screw is whether you have your hands up over your head or down lower. This time I think the screw was somewhere about even with his head and he had his hands even with his shoulder or head, or a little higher. The screw is the thing that lets the cable down—the screw has threads on it and is five or six feet long with handle bars that way (illustrating). He was standing on the lower step of the derrick stool, with one hand on the handles of the screw. I don't know where the other hand was, it is not necessary to take hold of it with both hands. He was turning the screw. You have to put some force to it sometimes to turn it. I had to be told what to do when I got back from the boiler, as I did not know what he wanted to do, whether he wanted to pull out, or what he wanted to do. Shortly after I come back he decided to pull the tools out of the hole. To pull them out you have to put the ropes on the bull wheels and release the clamps, take the clamps off the line, and take the beam down. The bull wheels are wheels with a shaft on them, you wind them to pull up, and unwind them to let them down. There is a cable that goes down into the hole on which the tools are hung. I don't know whether I could take a piece of paper and make a picture of one; I am no artist; I couldn't draw you one. The derrick stool was standing near the hole pretty close, about three feet away. The tools were in the hole, with the cable going on down to them. * * *

"After the tools were gotten out of the hole I don't believe there was any more work done. Mr. Herring said he was not able to work any more, and thought he would lie down and rest a while. You ask what he said was the matter with him. Now, I don't know whether he said that he had hurt his side or whether his side hurt him; I can't say which one of the two, but mind you, before that, you did not ask me the question a while ago, as we broke the clamps is when he complained; he asked me to assist him in breaking the clamps. He complained of his side, but never told me what was the matter with his side. He did not tell me what caused the pain. I did not see him fall there that day. He did not tell me he had fallen there that day, but when he quit he told me he believed he would go back in the belthouse and lay down awhile. He did that. The belthouse is attached to and is a part of the

derrick, where the belt goes through to the band wheel, and is between the derrick and the boiler and the engine. He did not tell me exactly that he had the cramps or had cramps in his stomach, but he caught his side and said it hurt him, or he had hurt his side; and believed he would go and lie down a while, and see if he would get better. He did not seem to get better after he lied down. I don't know just how long he was in the belthouse lying down, but he was there a few minutes and got up and left. You ask if he got up and left without assistance. Well, I did not assist him any; I was back there, though, and asked if he needed any assistance, and he said he thought he could make it; he said he believed he would go home and to tell Mr. Hale he would be back if he got to feeling better. He went home in his Ford car, but all I know is I saw him get in his car and started for home. * * *

"I don't remember which Mr. Herring told me, that his side hurt him or he had hurt his side. I did not see him fall off the derrick stool. I did not ask him how he hurt his side, if he told me he hurt it. I did not know where Mr. Herring lived, and had never been to his house. After he left that day I did not go to his house to see him, and never did see him again."

[2] We believe there is sufficient testimony to make an issue of fact as to whether the deceased was injured in the course of his employment. If he was so injured and, no one being present at the time of such injury, and since the plaintiff was precluded from testifying as to what he told her about the cause of his injury and how it occurred, and the doctor likewise so precluded, it would devolve upon plaintiff to prove by circumstances the fact of his injury in the course of his employment. In Railway Mail Ass'n. v. Harrington, 220 F. 622, 136 C. C. A. 230, by the Circuit Court of Appeals, deceased was a railway mail clerk, and on leaving his car at the end of the run gave indications of a severe pain in the abdomen. A few days later he became incapacitated, was taken to the hospital and operated upon, but died from peritonitis. There was a yellow spot of some size of recent origin on the skin over the appendix, and the autopsy developed that there were adhesions beneath such spot. It was shown that he was a young man and had previously enjoyed good health. Deceased was alone in his car during the run. That there was an iron rack in the car, the corner of which was about the same height above the floor as the discolored spot would be when the deceased was standing to the right. The Circuit Court of Appeals held that the evidence was sufficient to sustain the judgment below that the deceased died as a result of an accident occurring in his mail car, while he was performing the services of a railway mail clerk, and that the judgment should be affirmed.

In Merkel v. Railway Mail Ass'n, 205 Mo. App. 484, 226 S. W. 299, the deceased was like-

wise a railway mail clerk and in good health just prior to the injuries causing his death, and his wife testified that upon the return of her husband she made an examination of his stomach, and that it was black and blue with bruises all across the front; that her husband came home screaming with pain; that he was taken to the hospital, where he died three days later. In the opinion, Justice Becker, speaking for the court, said:

"Upon examination plaintiff found 'his stomach was black and blue; bruises all across the front of his stomach, * * * from his stomach on down into his bowels.' * * *

"This testimony in itself is evidence of external violence. And on this point the jury had in addition the testimony of an expert witness to the effect that the black and blue marks could not have been caused by anything except external violence.

"In light of this testimony, we are of the opinion, and so hold, that the jury had before them testimony as to facts which, if they believed, were evidences in themselves that the deceased suffered external violence."

See Travelers' Insurance Co. v. Murray, 16 Colo. 296, 26 P. 774, 25 Am. St. Rep. 267; Travelers' Insurance Co. v. Hunter, 30 Tex. Civ. App. 489, 70 S. W. 798, by the Dallas Court of Civil Appeals; writ denied.

We are of the opinion that the evidence is sufficient to sustain the verdict of the jury and the judgment of the court that the deceased died from an injury received during the course of his employment, and that his death was the proximate result of such injury.

It is true that the defendant below attempted to prove by the doctor who performed the operation, and introduced the nurse's record of the case while the deceased was in the hospital at Fort Worth, that there was no evidence of any external injury or violence to deceased's right inguinal region. Dr. Chas. H. McCollum testified that he performed an operation for appendicitis on the deceased, and that when he first saw the deceased at the hospital the latter looked bad, tired, worn, and pinched. He told the witness that he had suffered for a few days, having pain in his belly. He told him he had been a stout, strong man, lived at Eliasville, and was employed by some drilling company. That he had had good health throughout his life, and had never been operated on and had never received an injury. This witness testified that in his opinion the deceased died from natural causes, and not from any external violence. That he found no discolored or bruised condition on the outside of his stomach on the skin in the inguinal region.

But we think the whole evidence presented a question for the jury, and the verdict of the jury and the judgment of the trial court cannot be disturbed, in view of the evident conflict.

[3] Under another proposition, it is urged that it was error for the trial court to submit the question to the jury as to whether a failure to pay any amount which might be awarded in a lump sum would result in manifest hardship and injury. Mrs. Herring testified that after her husband died she had no funds or money with which to bury him. That she borrowed $552 from a friend and had not been able to repay that amount. That her husband owed $100 to the bank at the time of his death, and that she had no one to whom she could look for support, and was at the time of the trial running a small café at Eliasville. That her mother, who was 64 years old, was assisting her in running the café. That she and her mother were doing all the cooking and running the café. That she had no income or money from any source, except what she made in the café. That she worked from 5 or 5:30 a. m. until 9 or 9:30 at night. That she did not own her home, was renting, and was renting the café. That she had a little girl 7 years of age, the stepdaughter of her deceased husband. That she had no relatives from whom she could reasonably expect any assistance. That if the jury should see fit to award her the compensation for which she was asking in a lump sum she would buy some business of her own, and that she had in mind a rooming house, something from which she could make more than a living. That before her husband died and during his lifetime she depended upon his wages and salary for a living. That she believed that she had attained sufficient business acumen to run a rooming house. The Workmen's Compensation Act, art. 5246—33, Rev. Statutes, provides that, if in the judgment of the Industrial Board manifest hardship and injury would otherwise result, the Board may compel the association to redeem their liability by a payment of a lump sum, as may be determined by the Board. We think this testimony and other testimony of like nature justifies the submission of the issue to the jury and the finding of the jury thereon. Texas Employers' Insurance Ass'n v. Downing (Tex. Civ. App.) 218 S. W. 112, writ refused; Texas Employers' Insurance Ass'n v. Boudreaux (Tex. Civ. App.) 213 S. W. 674, reversed by the Supreme Court on other issues in 231 S. W. 756; Texas Employers' Insurance Ass'n v. Peterson (Tex. Civ. App.) 251 S. W. 572.

[4] Another objection is raised to the judgment below on the ground that a new trial should have been granted for newly discovered evidence. The witness whose testimony is desired is Sister Johanna, whose affidavit shows that she was a surgical nurse at St. Joseph's Infirmary at Fort Worth on July 22, 1922, and stated that she was in attend-

ance at the operation of one Charlie Herring on that date. The affidavit further states:

"Affiant further states that it is one of her duties just before operations for appendicitis to paint the abdomen with iodine and, if there are any unusual conditions, to make a record of same; that in the case of said C. H. Herring, she does not remember of seeing any bruises or discolorations from a bruise on the abdomen of said Herring; that the abdomen was badly distended as in cases of general peritonitis; that her records show no bruises or discolorations, and that she is required to make record of same, if apparent.

"Further affiant states that she had had eight years of operating experience.

"Further affiant sayeth naught."

This testimony is evidently cumulative of the testimony of Dr. McCollum, who testified that he saw no bruise or discoloration on the skin where he made the incision for the operation. That he did not recall finding any evidence of traumatism to the skin of the deceased on opening the abdomen. That he did not "recall any evidence of an external blow to the fat or on the muscles or on the peritoneum or on the big gut or on the little gut.". There is no showing of diligence or any reason given why the testimony of this witness was not introduced at the trial. So far as the record discloses, the nurse was at the St. Joseph's Infirmary at the time of the trial below, and we think that the court did not err in overruling the motion for a new trial on account of newly discovered evidence.

[5] An objection is urged to the following language of V. L. Shurtleff, of counsel for the plaintiff, in his closing argument to the jury, in which he said:

"She says that her husband told her what had happened to him; she says that he was bruised on his side. Dr. Edwards contended that the man's condition was caused by a traumatism, which in their language is a blow or a wound. Now, that is the thing that is at the very threshold of the case, and, while called for in his deposition, the law does not permit us to have Dr. Edwards swear what he told him, but it goes to the jury that way, and the jury must know that Edwards' idea must have been formed from the history of the case that he got. How would he believe that he was injured—that the injury was caused by a blow or traumatism—if the man he was talking to told him nothing like that he could not know; if the patient he talked to told him he had received a fall from the derrick stool and he found marks on the side, the discoloration and bruise, and he would then swear, just as he has sworn, just as he swore every time he took a statement from him, that in my judgment the condition was produced by a bruise or a wound."

The objection to this argument, as shown by the bill of exception is that thereby "counsel for the plaintiff got before the jury testimony which the court had rightfully excluded, i. e., alleged statements of the deceased, Charlie Herring, to his wife and to Dr. Edwards as to receiving an injury while at work at the well, on July 19, 1922, and by so doing and by said argument improperly influenced the jury to answer the special issues submitted to them as they did, and to render the verdict which they did render."

The trial court modified this bill of exception as follows:

"That while the Hon. V. L. Shurtleff was making said argument as set out in the bill, the Hon. Harry P. Lawther, counsel for the defendant, arose and stated, 'I don't want to interrupt, but want to take an exception to that.' Counsel for defendant did not, however, at that time state the grounds of his exception."

Mrs. Herring did testify that her husband, on his return from the well, and while he was suffering severe pains, told her that he had been injured. This testimony, apparently not objected to, and certainly not excluded, together with the testimony in evidence of the witness Campbell, already quoted, and the testimony of Dr. Edwards that his diagnosis was that the deceased died from traumatic appendicitis, that is, appendicitis caused by external violence, it seems to us authorized the inference and conclusion that the deceased was injured while at work at the well. It is probable that some of this argument may not have been authorized by the admitted testimony. For instance, "how would he believe that he was injured—that the injury was caused by a blow or traumatism—if the man he was talking to told him nothing like that he could not know; if the patient he talked to told him he had received a fall from the derrick stool and he found marks on the side, the discoloration and bruise, and he would then swear, just as he has sworn, just as he swore every time he took a statement from him, that in my judgment the condition was produced by a bruise or a wound?" But, even if this argument was objectionable, which question we do not decide, we think that the objection, being to the argument as a whole, and portions of the argument being in our opinion justified by the testimony in the record, and the objection made to the court, as shown by his modification to the bill of exceptions, failing to call the trial court's attention to what part of the argument objection was made, we conclude that no reversible error is shown.

All assignments are overruled and the judgment is affirmed.