## UNITED STATES FIDELITY & GUARANTY CO. v. ROCHESTER et al.*
### (No. 11340.)

(Court of Civil Appeals of Texas. Fort Worth. Jan. 9, 1926. Rehearing Denied Feb. 20, 1926.)

**1. Master and servant ⬅️373.**

Lightning causing death of employee *held* "act of God," within Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Act of God.]

**2. Pleading ⬅️34(7).**

On appeal, all reasonable intendments *held* indulged in favor of appellee's petition.

**3. Evidence ⬅️508—In classes of questions involving peculiar skill, science, or knowledge, experts may not only testify to facts, but to opinions respecting facts to enlighten jury; "expert."**

In certain classes of questions involving peculiar skill, science, or knowledge, witnesses possessing such skill, science, or knowledge may testify as experts, not only to the facts, but to the opinions respecting the facts so far as necessary to enlighten the jury and enable them to come to right verdict; "expert" meaning one instructed by experience, a man of science, person of skill, an experienced person, or person possessed of some peculiar science or skill.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Expert.]

**4. Evidence ⬅️9—Courts may take judicial notice of what is said in books relating to the subject of electricity.**

In determination of questions involving scientific or highly specialized subject, such as electricity, in addition to the light which may be afforded by testimony of witnesses, who have qualified as experts, courts judicially take notice

of what is said in the books relating to subject of electricity.

**5. Evidence ☞536—Court held not to have erred in overruling objection, for want of qualification, to witness, who testified as electrical expert on characteristics of lightning.**

In suit to set aside award made by Industrial Board for death caused by lightning when deceased was engaged in excavating a pipe line with steel shovel, *held*, in view of judicial notice which may be taken of characteristics of lightning, court did not err in overruling objection, for want of qualification, to witness, who testified as electrical expert on characteristics of lightning, even though witness testified that his experience with electricity was mostly along automobile work, motor and generator work, and wiring.

**6. Master and servant ☞405(4)—Finding employee, struck by lightning when excavating with steel shovel, was performing duties subjecting him to greater hazard from act of God than general public, held supported by evidence (Workmen's Compensation Act, pt. 4, § 1 [Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82]).**

Finding that deceased, who was struck by lightning while engaged in excavating pipe line with steel shovel, was engaged in the performance of duties subjecting him to greater hazard from act of God, responsible for the injury, than ordinarily applies to general public, thereby making death compensable, in view of Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82), *held* supported by evidence.

### On Motion for Rehearing.

**7. Trial ☞29(3)—It is error for trial judge, by questions or otherwise, to intimate witness is not worthy of credence, or to state opinion on question for jury's determination.**

It is error for trial judge, in jury trial, by questions or otherwise, to intimate that witness is or is not worthy of credence, or to directly or by necessary implication state his opinion on question for jury's determination; but rules in this respect should not be extended unreasonably.

**8. Trial ☞18—Trial judge should not be restricted to functions of mere umpire between opposing counsel.**

Trial judge is entitled to fair treatment, and he should not be restricted to function of mere umpire between opposing counsel.

**9. Appeal and error ☞901—When it is apparent that trial judge has made fair effort to see that truth was established and justice done, complaining party has burden of showing court's action was prejudicial.**

Court, being charged with fundamental duty of seeing that truth is established and justice done, must be guided by statutes and authority of decisions; but, when it is reasonably apparent that he has made a reasonably fair effort to do so, complaining party has burden of showing court's action was materially prejudicial to him.

**10. Appeal and error ☞1046(5) — Court's questioning of electrical expert as to dangers from lightning held not prejudicial, where, on objection to question, court withdrew it and instructed jury not to consider its questions.**

In action to set aside award made for death of deceased, who was struck by lightning, when engaged in excavating pipe line with steel shovel, court's questioning of witness, who testified as expert as to danger from lightning, *held* not prejudicial, where no objections were interposed to first four questions, and, on objection to fifth, court withdrew question and thereafter specifically instructed jury not to consider questions asked by it.

**11. Trial ☞133(6)—Counsel's argument as to big corporation sending shrewd lawyer to hornswoggle widow out of verdict held not prejudicial, where, in reply to opposing counsel, court instructed jury not to consider it.**

In action by insurance company to set aside award made by Industrial Board, defense counsel's argument referring to a big corporation sending shrewd lawyer to hornswoggle widow out of verdict *held* not prejudicial, where it appeared that assertion was in reply to assertion by plaintiff's counsel, and jury was instructed at conclusion not to consider such statement.

**12. Appeal and error ☞925(3)—It is presumed jury attached proper meaning to word "hornswoggle" used in argument, in absence of contrary showing.**

In action to set aside award of Industrial Board, *held*, in absence of contrary showing, it is presumed that jury attached proper meaning to word "hornswoggle" as used in argument of defense counsel, which word is defined as "to triumph over; overcome; beat; bedevil."

Appeal from District Court, Clay County; Paul Donald, Judge.

Suit by the United States Fidelity & Guaranty Company against Mrs. W. C. Rochester and others to set aside an award of the Industrial Accident Board. From a judgment for defendants, plaintiff appeals. Affirmed.

Seay, Seay, Malone & Lipscomb, of Dallas, and Wantland, Dickey & Glasgow, of Henrietta, for appellant.

McBride & McBride, of Corsicana, and E. W. Napier, of Wichita Falls, for appellees.

CONNER, C. J. On the 30th day of July, 1924, W. C. Rochester, while working for the Lone Star Gas Company, was killed by lightning. His widow, Mrs. W. C. Rochester, for herself and as next friend of her two minor children, Mary Lou and Willie C. Rochester, within the time and in the manner prescribed by law, presented her claim to the Industrial Accident Board at Austin, Tex., and an award was made by said board on the 16th day of October, 1924, in favor of the said Mrs. Rochester and children and her attorneys, as provided in the Workmen's Compensation Law (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91).

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The appellant company, being dissatisfied with the award, gave due notice that it was unwilling to and would not consent to be bound by the award of the board, and within the time and in the manner prescribed by law instituted this suit in the district court of Clay county for a trial of the issues presented. The usual and customary form of petition was filed by appellant, to which the appellees answered by a general demurrer and a special plea, to the effect that on the 30th day of July, 1924, W. C. Rochester, while in the employ of the Lone Star Gas Company was engaged in excavating a 6-inch and a 2-inch pipe line at or near Lake Gage in Clay county, Tex., which pipe line was buried 18 inches under the surface of the ground; that he was using a steel shovel in removing the earth from said pipe line, and while so engaged was struck by a bolt of lightning, producing immediate death. They further pleaded the award of the Industrial Accident Board and prayed for its affirmance, and that appellees be granted a lump sum in settlement.

Appellant answered by a general demurrer and a special plea presenting the defense that on the 30th day of July, 1924, said W. C. Rochester was killed by an act of God, and was not at said time engaged in the performance of any duties which subjected him to a greater hazard than ordinarily applied to the general public, and that hence, under the terms of article 5246—82 of the Workmen's Compensation Act of the state of Texas, appellant was not liable.

The cause was submitted to a jury upon the following special issue: "Do you find from the preponderance of the testimony that W. C. Rochester, at the time of his injury, was engaged in the performance of duties that subjected him to a greater hazard from the act of God, responsible for the injury, than ordinarily applies to the general public?" To which the jury answered, "Yes." Upon this verdict judgment was entered in behalf of the appellees, in accordance with the prayer of their petition, and the United States Fidelity & Guaranty Company has duly prosecuted an appeal.

It is not denied that the deceased's employer, the Lone Star Gas Company, was a subscriber, as defined in our Workmen's Compensation Act, and hence that the appellant, the United States Fidelity & Guaranty Company, is liable under the terms of the Compensation Act for the amounts awarded below, unless relieved under the terms of article 5246—82 of our Revised Civil Statutes (Vernon's Ann. Civ. St. Supp. 1918). That article, so far as pertinent, reads as follows:

"The term 'injury sustained in the course of employment,' as used in this act, shall not include: (1) An injury caused by the act of God, unless the employé is at the time engaged in the performance of duties that subject him to a greater hazard from the act of God responsi-

ble for the injury than ordinarily applies to the general public."

[1] That the bolt of lightning which caused the death of the deceased falls within the definition of "an act of God" there can be no doubt. The vital question is whether at the time of deceased's death he was engaged in the performance of duties that subjected him to a greater hazard from the act of God referred to than ordinarily applies to the general public. As noted, the jury found that he was. But appellant denies this proposition and complains of the action of the court in overruling its general demurrer, and in refusing to give to the jury a peremptory instruction in its behalf, and urges a want of sufficiency of the evidence to sustain the finding of the jury.

[2] The case is one of first impression in this state, so far as we have been able to discover, and the determination of the questions presented have not been without difficulty. Indulging in its favor all reasonable intendments, we think appellees' petition sufficiently stated the cause of action.

The witness H. T. Hamilton testified on the trial of this case that W. C. Rochester was killed on the 30th day of July, 1924; that at the time he was killed he was digging a ditch on the Lake Gage 6-inch pipe line, and that he with other men in the gang were stationed about 20 feet apart and were actively at work in removing dirt from the pipe line; that Mr. Rochester was struck by a bolt of lightning which resulted in his death; that the place where the men were working was a flat, open country, with the exception of a few trees which were something like 150 or 200 yards from the place where Mr. Rochester was working; that there were no buildings or other structures closer than 200 or 300 feet from where the men were working, but there was a cloud back to the southeast, a considerable distance from them; that there was no evidence of any lightning or a rain storm in the vicinity, and that, if it had become threatening, the men would have left the work and sought shelter; that, as a general rule, when a rain storm did blow up they would stop work and seek shelter; that the pipe line which was being excavated was about 18 inches under the surface of the ground; that the pipe line had been abandoned and was dry; that each of the men working on the job were using either steel bladed shovels or sharpshooters; that the men would station themselves about 20 feet apart and each would remove earth down to the pipe for his allotted 20 feet and then move down below the other men and begin a new section; that just prior to the time that Mr. Rochester was killed he had completed removing the earth on his 20-foot section and had moved down below the other men to begin a new section; that suddenly, and with-

out any warning, a bolt of lightning struck Mr. Rochester, splitting the handle of the shovel with which he was working, and resulting in his death. The witness Dalton Harris testified to substantially the same facts, as did J. D. Gee and J. J. Grisson. These were all of the fact witnesses.

The appellees introduced as an expert the witness J. L. Kelley, who testified, among other things, that:

"A man standing over a pipe line or close to it, if the pipe line was steel, would attract electricity, and I think if a man had a steel shovel like that in his hands and he was over a pipe line he would be in a more dangerous position of electricity 'than he would be if he was standing away from it; that is, if he had those instruments in his hands."

This witness further testified that:

"Lightning begins in the elements and if it is close enough to the earth it would make a ground connection. It is a fact that lightning flows about through the elements depending on atmospheric conditions, the density of the clouds, and the amount of moisture in them. It will sometimes start out considerably high up in the sky with a high voltage, but will come down through clouds that vary in moisture and density and the amount of electricity in them likely will be reduced, but it seeks to travel through the sky along the lines of least resistance and hunt the ground somewhere."

This witness further testified, in substance, on cross-examination, that he would not think that any electricity would come from a pipe line buried some 18 inches in the ground; that he did not know whether the shovel deceased was using had anything to do with his being struck by lightning; that a man who went by a hardware store and bought a shovel and was walking down the street with it in his hand would be subjected to as much risk as the man out in the field, and that a man crossing a city street with pipes underground, or a farmer who was out in the field with a steel cultivator, or a plow, would have metal about him that lightning might strike; that any man who happened to be out in the elements and had an instrument with him that had some steel about it would be, to a certain extent, exposed to the danger of being struck by lightning.

Before proceeding further with our disposition of the case, we think we should dispose of appellant's objection in the court below, and here, to the qualifications of witness Kelley to testify as an expert. The record relating to this subject is substantially as follows:

"My name is J. L. Kelley. I am a resident of Clay county, Tex. I have had experience with electricity. The most of my experience has been along automobile work, motor and generator work, and wiring. I have been engaged in that line of work 15 years and along those lines I think I can qualify as an expert in electricity. I have studied electricity in a school or place of learning. I studied in an automobile school, a correspondence course and practical experience, and I have studied under electrical engineers. I attended Ray's School in Kansas City, but I did not take their complete course. I do not hold any degree from that school. I only attended school a short while, 2 weeks. My experience has been confined to automotive electricity, that is, generator apparatus, and things of the sort, and I have studied direct and alternating electricity. Automotive electricity is what is commonly known as static electricity. Static electricity is electricity that is still. It is true that all electricity about an automobile is self-generated and is of a very different character of electricity and an entirely different field than that of zigzag or loose lightning. It is different. It is not exactly like it, but it is not altogether different. It is the same thing too. That is my opinion and about all the difference I can see in loose lightning and self-generated electricity is this is under control we have got, but it is all electricity.

"Q. As a matter of fact isn't the whole gist of it you are not able to control it? Isn't that what troubles you electricians, whether or not you can control it? A. It is a pretty deep study."

Counsel for appellant then and there in open court objected to any testimony from this witness as an expert because he was not properly qualified. This objection was overruled, and over the objection of this appellant the witness was permitted to further testify as follows:

"With my experience with lightning and my experience with electricity, it is impossible for any man to know anything about it, about loose lightning in the air; no further than a man can see or test with instruments, you can't tell anything about it, but I do know that loose lightning seeks ground.

"Q. Please state whether or not you know electricity, where it is wired up, makes an ordinary circuit, and if electricity gets loose in the air and there is no circuit for it, it will jump to the closest circuit? A. Your question is you want to know if electricity travels in a circuit, and if it is loose it will make this jump a certain distance to make a connection.

"Q. Yes, sir. A. It does. And it is true that electricity that might be loose will seek to ground itself; all electricity seeks the ground or earth, but I am not able to say whether or not the minute electricity goes into the ground it spends itself. Steel and all metals are conductors of electricity, and some more so than others, and it is my opinion that the shovel there would conduct electricity or draw lightning, that is, the steel part, and if the handle was damp or wet it would conduct electricity; and as to whether or not I know of my own personal knowledge whether or not perspiration from the hands is sufficient to be a conductor of electricity, will state it is with the electricity I come in contact with. I know that water is a conductor of electricity, and, according to my experience, a man standing over a pipe line, or close to it, if the pipe line was steel, it would attract electricity, and I think if a man had a steel shovel like that in his hand, and he was over a pipe line, he would be in a more dangerous position of electricity than he would if he was standing

away from it, that is, if he had those instruments in his hands. As to my experience with lightning, will state that I have had it strike pretty close several 'times; I never did take it apart and examine it to see what it was made out of. As to whether or not I know the difference between these streaks of chain lightning, will state I do, in a way, but I don't know whether I could explain it or not. I don't know whether I could go into it and explain why some lightning is sheet lightning that lights up the whole sky and that other lightning is streaked, and the schooled and experienced electrician will tell you that they know nothing about it only what they have observed; but as to where lightning is going to strike and why it strikes is pretty much of a big question to a schooled electrician. It is generally believed that lightning will strike where it —it follows the path of least resistance all the time. I still believe in the old lightning rod theory, and the lightning rod theory is that it is a conductor of electricity, that it will conduct the electricity on to the ground—convey the electricity to the ground, and the object of putting lightning rods on a house is to keep the electricity from striking the house, or burning it; as a matter of act, when you stick a steel rod, with a sharp point on it, into the atmosphere, you are attracting lightning. I have stated that steel and metal of that sort are conductors of electricity, most of it does, and as to whether or not I think that a house with lightning rods on it would be more likely to be struck than one that didn't, will state I wouldn't think so; it would hit the rod and go down into the ground. Electricity does not come up from the ground, it goes to the ground. I wouldn't think that a pipe line buried some 18 inches in the ground, there would be any electricity coming from that pipe.

"Q. If there was a bunch of men working there on a pipe line, and several of them were working near where the pipe was exposed, and they are down next to it with their shovels, they would be more likely to be struck with it than a man 15 or 16 feet away from it? A. Maybe this lightning wasn't in their immediate vicinity.

"Q. If that pipe line was all connected up it would be in his vicinity, wouldn't it? A. Maybe the lightning was further back; maybe it struck further back. If the lightning was in his immediate vicinity, and he had a steel shovel in his hand, standing by a piece of exposed pipe, he would be more exposed to electricity than a man standing 60 feet away on the ground.

"Q. If those men are out there within 20 feet, they are close to one another? A. Not according to lightning. From my observations you will see two trees standing close together, the lightning will strike one and let the other alone. Wood, as a rule, is a nonconductor, unless it is wet, and your question as to whether a man working out in a field working on a dry, hot summer day, working with his shovel, would perspiration on his hands be sufficient to saturate the entire handle of the shovel and make it a conductor, will state I don't know how much he would perspire. I know I wouldn't perspire handling a shovel; I don't think I would use it long enough. And whether a man would have to do a considerable amount of perspiring in order to sufficiently saturate the handle of his shovel and make it a conductor, will state the electricity we handle, automotive electricity, if a

man would rub a damp hand up and down on the handle of that shovel, a high tension current would follow that, that is, if he was in direct contact with the ground, but whether or not there would be enough current in the air to draw a bolt of lightning out of the sky several feet away I am unable to say. I don't know whether that was what happened on this occasion or not, and I don't know whether that shovel had anything to do with Mr. Rochester being struck by lightning that day or not.

"Q. Wouldn't a man, according to your theory, if he had gone by a hardware store and bought a shovel and was walking down the street with the shovel in his hand, wouldn't he be subjected to as much risk as the man out in the field, so far as the shovel was concerned? A. Yes, sir; I think so. As far as pipes under the ground is concerned, you can't walk 100 feet through an ordinary city without crossing pipes several times. All these towns around here are lined with pipes, and every time one of these farmers go out in his field with one of these steel cultivators or plow with a disc plow he has a metal that lightning might strike. I would think that any man who happens to be out in the elements, and had an instrument about him, or had to work with an instrument that had some steel about it, would be, to a certain extent, exposed to the danger of being struck by lightning, and that is as true of a farmer working in the field with his plow as this man working on the pipe line, but I don't know whether he would be in as much danger or less; it would depend on how much steel he had around him. And as to whether or not a man working in the field, with the ground all wet, and working on a steel cultivator, would be in more danger than Mr. Rochester, will state I don't know his situation, but with your explanation of the situation, that is, that this man was working out there in a field, the very much same character field you will find around Henrietta, working on a dry abandoned pipe line, and that the pipe line is buried some 14 or 18 inches in the ground; that he has some 60—anywhere from 40 to 60, or perhaps a little more distance, in feet, from that part of the pipe line that is exposed, and is standing on top of the ground; the ground is hard and dry enough so it is difficult to get a spade, or one of these sharpshooters they speak of, through it; there is a cloud some distance away in the southeast and there has been one or two bolts of lightning, but the weather wasn't threatening where this man was working, and it is dry and hot, and he was working with this shovel here, whether or not in my opinion he would be subjected to any greater hazard by being struck by lightning than any other man out there, if any, that had steel about him, will state there is lots of things a man might have to take into consideration to pass on that, the nature of the ground; some soil has more iron in it than others, and lightning will invariably strike where there is a rock in the ground. Rock is usually a conductor of electricity because rock usually contains minerals that are. Rock lays closer together and it is more of a conductor of electricity than ordinary loose earth. My understanding is that rock is a conductor of electricity. I am positive that rock is a conductor of electricity, and I believe that if lightning should strike in the vicinity of where these men were working, with the same character of tools

and in the same character of soil, and in the same character of weather conditions that Mr. Rochester was, and that they were where this pipe had been uncovered and was exposed, they would be more likely to be struck by lightning than a man who wasn't where the pipe was exposed. I do not undertake to say why lightning strikes in any particular vicinity, I don't understand it, and I don't believe any one else does. Lightning begins in the elements, and, if it is close enough to the ground, it would make a ground connection. It is a fact that lightning flows about through the elements, depending on atmospheric conditions, the density of the clouds and the amount of moisture in them. It will sometimes start out considerably high up in the sky, with a high voltage, but will come down through clouds that vary in moisture and density. and the amount of electricity in them likely will be reduced, but it seeks to travel through the sky, along the lines of least resistance and hunt the ground somewhere, and that is all anybody knows about lightning. I don't understand why lightning will strike in any particular place, except it is following the path of least resistance, and seeking to get to the ground as quick as it can; and my opinion is, the reason it struck at this particular spot where Mr. Rochester was killed, the path of least resistance led to that spot. He happened to be there near this spot when it came down—it would follow the least resistance, and, if he was standing in that immediate place, it would hit him before it hit the ground."

[3] It is well settled that in certain classes of questions involving peculiar skill, science, or knowledge, witnesses possessing such skill, science, or knowledge may testify as experts, not only to the facts, but to their opinions respecting the facts so far as necessary to enlighten the jury and to enable them to come to a right verdict. It is said that it is not necessary in this day to draw any nice distinctions between the various definitions of the word "expert." It has been said to mean one "instructed by experience," "a man of science," "a person of skill," "an experienced person," "a person possessed of some peculiar science or skill." See 2 Jones, Blue Book on Evidence, §§ 267, 268. In the latter section, among other things, it is said:

"To entitle a witness to answer as an expert, it is true 'he must, in the opinion of the court, have special acquaintance with the immediate line of inquiry, yet he need not be thoroughly acquainted with the differentia of the specific specialty under consideration. If this were necessary, few experts could be admitted to testify; certainly no courts could be found capable of determining whether such experts were competent. A general knowledge of the department to which the specialty belongs would seem to be sufficient.' The value of the testimony is enhanced or depreciated according to the experience or study of the witness."

[4] In addition to the light that may be afforded by the testimony of a witness who has, in the judgment of the court, manifested sufficient learning, skill, or experience to authorize the conclusion that he can be classed as an expert, and, as such, properly aid a jury in arriving at a just determination of a question involved in a scientific or highly specialized subject, some of the cases we have examined, notably the case of Emmick v. Hanrahan Brick & Ice Co., 201 N. Y. S. 638, 206 App. Div. 580, the courts have judicially taken notice of what is said in the books relating to the subject of electricity. In the case mentioned, the court said:

"Knowledge concerning atmospheric electricity is by no means complete, but something is known concerning it, and the court is justified in verifying its information or refreshing its recollection from recognized authorities. Chiulla de Luca v. Board of Park Commissioners of the City of Hartford, Conn., 94 Conn. 7, 107 A. 611. Electrical energy exists in ions in the atmosphere and in drops of vapor in the clouds. This energy is positive or negative, and those energies of opposite signs attract. Generally, or at least often, the electrical energy in the clouds is of the opposite sign to that in the earth. When a cloud containing electrical energy passes sufficiently near, over a hill or a live tree or other objects projecting above the earth, the current passes between the cloud and the object on the earth, and the lightning flash occurs. It is known that atmospheric electrical energy acts similarly to electrical energy in a laboratory. It naturally passes through the best conductor. It will pass a greater distance between two copper points than between two iron points. Likewise, wet or green timbers are better conductors than dry timbers. A twisted wire cable, or the human body, is a better conductor than a dry timber or board. See Enc. Brittanica (11th Ed.) under subjects 'Lightning' and 'Atmospheric Electricity.' "

See, also, the case of Madura v. City of New York, 144 N. E. 505, 238 N. Y. 214, where a laborer while seeking shelter from a storm, under a tree, was struck and killed by lightning. The court held that the claim arising from the accident was compensable, and, in discussing the case, said:

"The only question then is whether, as a result of his employment, which continued while he sought shelter, he was exposed to any unusual risks. Matter of Katz v. A. Kadans & Co., 232 N. Y. 420, 134 N. E. 330, 23 A. L. R. 401.

"We think that, as the result of the judicial knowledge, which may be taken of scientific facts, the Industrial Board was permitted, without expert evidence, to find as it did by implication, and that we are permitted to say that he was. It is a matter of widespread scientific belief and declaration that a wet tree is a ready conductor of a current of electricity, and that a person standing under such a tree is exposed to a degree of danger which does not confront one in the open spaces of a highway or field. Chiulla de Luca v. Bd. Park Com'rs of City of Hartford, Conn., 94 Conn. 7, 107 A. 611. This scientific belief is so widespread that we think the Industrial Board had the right to take notice of it, without testimony, in deciding that this accident was the result of a special risk incidental to the employment of decedent. Jackson v. Wisconsin Tel. Co., 88 Wis. 243, 60 N. W. 430, 26

L. R. A. 101; Starr v. South Bell Tel., etc., Co., 156 N. C. 435, 72 S. E. 484."

[5] Under the rules so indicated, we feel unable to say that the witness Kelley was incompetent and that the trial court erred in overruling appellant's objection to his want of qualification; and, if we are correct in this, we think we must further hold that the evidence and facts of which we may take judicial notice are sufficient to sustain the jury's finding and support the trial court's judgment following it. It is true cases are cited in behalf of appellant which would seem to lead to a contrary conclusion, such as Hoenig v. Industrial Commission, 150 N. W. 996, 159 Wis. 646, L. R. A. 1916A, 339, by the Supreme Court of Wisconsin; Klawinski v. Lake Shore & M. S. Ry. Co., 152 N. W. 213, 185 Mich. 643, L. R. A. 1916A, 342, by the Supreme Court of Michigan; Griffith v. Cole Bros., 165 N. W. 577, 183 Iowa, 415, L. R. A. 1918F, 923, by the Supreme Court of Iowa; Thier v. Widdifield, 178 N. W. 16, 210 Mich. 355; Wiggins v. Industrial Accident Board, 170 P. 9, 54 Mont. 335, L. R. A. 1918F, 932, Ann. Cas. 1918E, 1164. These cases, however, are cited in the case of Madura v. City of New York, supra, and of them the court there said:

"In the cases which have held that an award should not be made for death resulting from such a cause, there has been quite uniformly a finding of fact that there was not any unusual risk of such an accident incidental to the employment, and that therefore the accident could not be charged to the latter, or said to spring out of it."

[6] It is to be observed that in the case before us there is a distinct finding by both the Accident Board and the jury, to the effect that the deceased at the time of his injury "was engaged in the performance of duties that subjected him to a greater hazard from the act of God, responsible for the injury, than ordinarily applies to the general public." And this finding, under the authorities and under well-recognized rules that we must follow, cannot, we think, be said to be unsupported by the evidence, or set aside. See, generally, People's Coal & Ice Co. v. District Court of Ramsey County, 153 N. W. 119, 129 Minn. 502, L. R. A. 1916A, 344; Emmick v. Hanrahan Brick & Iron Co., 201 N. Y. S. 638, 206 App. Div. 580; Andrew v. Failsworth Inc. Society, 2 K. B. 32, 90 L. P 611; Hoenig v. Industrial Commission, 150 N. W. 996, 159 Wis. 646, L. R. A. 1916A, 339; Klawinski v. Lake Shore & M. S. Ry. Co., 152 N. W. 213, 185 Mich. 643, L. R. A. 1916A, 342; Kelly v. Kerry County Council, 42 Ir. Law Times (Ct. App.) 23; Griffith v. Cole Bros., 165 N. W. 577, 183 Iowa, 415, L. R. A. 1918F, 923; Thier v. Widdifield, 178 N. W. 16, 210 Mich. 355; Wiggins v. Industrial Accident Board, 170 P. 9, 54 Mont. 335, L. R. A. 1918F, 932, Ann. Cas. 1918E, 1164.

Several minor and incidental questions are raised in the brief of appellant, but after examination we do not think them of a character which requires discussion or authorizes a reversal of the judgment; so that, on the whole, we conclude that the judgment below must be affirmed.

## On Motion for Rehearing.

We have carefully considered the forceful motion for a rehearing presented by the able counsel for appellant, and confess, as we did in our original opinion, that the vital question raised in various forms has seemed difficult of a correct determination; but, in the absence of adjudicated cases that are considered clearly in point, and that we feel should be approved, to point the way, we do not see our way clear to grant the motion. Nor on the vital question do we feel that we can, without prolixity, materially add to the views expressed in our original opinion. We think it sufficient to say that we adhere to what is there said and to be implied.

By reference to our original opinion, however, it may be seen that in concluding we used the following language, to wit:

"Several minor and incidental questions are raised in the brief of appellant, but after examination we do not think them of a character which requires discussion or authorizes a reversal of the judgment."

Among the questions disposed of in this general way is one presented by appellant's sixth and seventh propositions for reversal. Under those propositions it is urged that the trial court committed reversible error in propounding certain questions to a witness, and of our general disposition counsel complain as follows:

"This court, much to our surprise, dismisses a serious question of that character by simply stating: 'Several minor and incidental questions are raised in the brief of the appellant, but after examination we do not think them of a character which requires discussion or authorizes a reversal of the judgment.'

"We must most respectfully, but, nevertheless, most emphatically, disagree with this honorable court when it holds that the action of the trial court, under facts and circumstances such as shown by the record in this case, constitutes a minor and incidental question. We believe that we are amply supported in this position by no less authority than the Supreme Court of this state, for in the case of Hargrove v. Fort Worth Elevator Co., 276 S. W. 426, the case is reversed on the sole ground that the conduct of the court in propounding certain questions to a witness was prejudicial and the court, after setting out the facts, uses this language:

" 'These questions indicated that the judge was not only attempting to discredit the testimony of the witness, but also was of the opinion that the nuisance complained of was not caused by the defendant in error, but was caused by the Ralston Purina Mills. This conduct was improper, and calculated to prejudice the rights of plaintiff in error. It was clearly an interfer-

ence with the right of a litigant to have the jury pass on issues of fact without being influenced by prejudicial statements made by the judge in their presence and hearing. It was unfair, and we may not presume that the injury resulted.

" 'On the trial of all cases the judge should preside with impartiality, and in a trial before a jury, who are the sole judges of the credibility of witnesses and the weight to be given their testimony, he should be especially careful to say or do nothing which would be calculated to influence their minds in regard to facts in issue, the solution of which it is their duty to determine. While it is within his authority to examine witnesses, in doing so he should not indicate by words or manner either' his disbelief of a witness or of a material fact which a litigant is endeavoring to establish.'

"It is exceedingly difficult for us to understand why a court that bears the unimpeached record for fair dealing and a desire to see that the parties litigant receive at the hands of courts and juries the treatment to which they are entitled which this honorable court bears, could pass by conduct of this character on the part of the trial court without even so much as a reprimand in its opinion, but, on the contrary, should tend to lend encouragement of this character on the part of the trial court by reciting in its opinion that when a litigant raises a question of this character it should be met with the terse statement that it is a minor and incidental question. We wish to assure this honorable court that we have never at any time presented a question to an appellate court in a light or frivolous manner or for the mere purpose of incumbering the record or taking up the court's time and attention. We would add further that this proposition of error was presented in the best of faith, is founded on facts, and, had we the power to convey to this court the surrounding facts and circumstances, we do not hesitate to say that this court would unquestionably reverse and remand the case on this one proposition alone, and we certainly think that it is entitled to more careful consideration than this court has seen fit to accord it. We respectfully urge that the court reconsider its action on this question and withdraw that portion of its opinion which dismisses it in such a light manner and enter such an opinion in this case as will at least serve as a warning to trial courts in the future to give to every litigant that fair and impartial trial which is the very bulwark of our institution of free government."

We beg to assure counsel, for whom we have very great respect, that it was very far from our thought to impute to them any frivolity or want of sincerity in urging error in this respect. We had considered the propositions and merely thought that the matter was not of sufficient importance to add to an opinion perhaps already too lengthy; but, inasmuch as counsel are so insistent, we will notice the question more particularly.

Omitting formal parts, the bill of exception taken at the time reads as follows:

"Be it remembered on the trial of the above entitled and numbered cause, after the defendants had placed the witness J. L. Kelley upon the stand, and after the attorneys for both defendants and plaintiff had concluded their direct and cross-examination, the court, upon his own motion and over the objection of plaintiff, propounded the following questions to him, to wit:

"The Court: How long have you been living in this country? A. I have been in this county 5 years.

"Q. Have you noticed at what season of the year they have more lightning than any other season? A. Yes, sir.

"Q. What season of the year? A. In the spring.

"Q. They have more in the summer time than in the winter time? A. Yes, sir.

"Q. What would be your idea of a man working on a pipe line with 300 feet exposed on July 30th? In your opinion, would they be engaged in a more hazardous work than ordinary men would be engaged in if not around this exposed pipe?

"Mr. Malone: We will object to that line of questioning, if the court please. We do not think it is admissible.

"The Court: All right, Mr. Kelley, you need not answer.

"To which action on the part of the court the plaintiff objected for the following reasons, to wit: (1) Because said questions showed by their manner and form that the court was in sympathy with and was seeking to aid the defendants in securing a recovery against this plaintiff; (2) because such action on the part of the court displayed a bias and prejudice on his part in favor of the defendants and against this plaintiff; (3) because such action on the part of the court was a comment upon the weight of the evidence by the court; (4) because such action on the part of the court was an attempt upon his part to aid and assist the defendants in making out a case, and to supply testimony which he considered to be necessary to assist them in securing a recovery.

"To the action of the court in thus interrogating the witness, the plaintiff then and there in open court excepted and here and now in open court tenders this its bill of exception No. 3, and prays that same may be examined, signed, and approved by the court, and ordered filed as a part of the record in this cause, this the 23d day of December, A. D. 1924.

"Seay, Seay, Malone & Lipscomb,
"Wantland, Dickey & Glasgow,
"Attorneys for plaintiff.

"This bill of exception examined and found correct with the following qualification: At the conclusion of the testimony, and before the cause was submitted to the jury, the court, on his own motion, instructed the jury not to consider for any purpose the questions propounded by the court to the witness J. L. Kelley, as above set out, nor to consider his answers thereto, and with such qualification is signed, approved, and ordered filed as a part of the record in this cause, this the 23d day of December, A. D. 1924.
"Paul Donald,
"Judge Presiding."

[7-9] We see nothing in all this that justifies a reversal of the judgment below or even worthy of extended discussion. We have no disposition to criticize or disapprove what was said on the subject in the case of Hargrove v. Fort Worth Elevator Co. (Tex. Com.

App.) 276 S. W. 726. It is undoubtedly true that it is error for a trial judge in a jury trial, by questions or otherwise, to intimate that a witness is or is not worthy of credence, or to directly or by necessary implication state his opinion on a question for the jury's determination. But the rules in this respect should not be extended to unreasonable lengths. The trial judge is entitled to fair treatment. He should not be restricted to the functions of a mere umpire between opposing counsel. He is charged by conscience and law with the fundamental duty of seeing that truth is established and justice done. In doing this, of course, he must observe and be guided by the statutes and authoritative decisions designed to bring about such results; but, when it is reasonably apparent that a disinterested and fair effort has been made to do so, we think the complaining party should bear the burden of showing clearly that the court's action was materially prejudicial to him.

[10] It is incumbent on a trial judge to hear and understand what testifying witnesses say in order to properly prepare and submit to the jury the issues, to intelligently pass upon bills of exceptions, motions for a new trial, statements of fact, excess in verdicts, etc. Apparently the bill of exception shows that no objection was urged to the first four interrogatories propounded by the court to the witness until after the witness had answered, and that, upon objection being made to the fifth, the court immediately withdrew the question, and later, as shown by his explanation, specifically instructed the jury not to consider for any purpose the questions propounded by the court to the witness, nor to consider his answer thereto. We fail to see in the questions propounded any plain indication of bias or prejudice on the part of the court, and certainly think, under the circumstances, an intelligent jury would not be misled thereby to the prejudice of the appellant.

[11, 12] A similar complaint is made of our general disposition of an error assigned to certain language used by counsel for appellee in his argument to the jury. As shown by the bill of exception taken at the time, the language objected to is as follows:

"Tell me there is no evidence. A great big corporation sends a shrewd lawyer (pointing to counsel for the plaintiff, United States Fidelity & Guaranty Company) to hornswoggle this widow out of a verdict."

We do not wish to be understood as approving the argument, for this court at all times has endeavored to closely confine counsel in argument to the evidence and the record, but it is rare that a court will indulge the complaint of a party who has provoked the objectionable argument, and it will be noted from the opening phrase of the argument under consideration, "Tell me there is no evidence," that it is indicated that the remarks of counsel were in reply to an assertion of counsel for appellant. The facts that appellant was a corporation doing business in more than one state, and appellee a widow, were before the jury appearing on the face of the pleadings, and the art or shrewdness of appellant's counsel was doubtless manifested throughout the trial, and of which the jury were not probably misled or influenced by the statement of counsel for appellee. While the term "hornswoggle" cannot be approved by the literati and may sound somewhat formidable, it has, nevertheless, found its way into the English language as a simple slang word meaning, as defined by Mr. Webster in his unabridged dictionary, "to triumph over; overcome; beat; bedevil." In the absence of it appearing otherwise, we must assume that the jury attached the proper meaning to the term. If so, and if any weight whatever was given by the jury to the expression, it is improbable that greater force was given than was otherwise apparent. From the evident vigor and ability displayed by counsel for appellant and from what otherwise appeared throughout the course of the trial, it must have been obvious to the jury that appellant was exerting every effort to defeat appellee's claim. Moreover, the court, in approving the bill, certifies that "at the conclusion of counsel's speech the court instructed the jury not to consider the above statement." Under such circumstances, we cannot think it our duty to reverse the judgment on the ground thus urged. See American Freehold Land Mortgage Co. v. Brown, 118 S. W. 1106, 54 Tex. Civ. App. 448; Davis v. Kennedy (Tex. Civ. App.) 245 S. W. 259; Uvalde Co. v. O'Brien (Tex. Civ. App.) 265 S. W. 1083; Gulf, H. & S. A. Ry. Co. v. Henry (Tex. Civ. App.) 252 S. W. 213; Houston & T. C. Ry. Co. v. Alexander (Tex. Civ. App.) 121 S. W. 602; Fordtran v. Stowers, 113 S. W. 631, 52 Tex. Civ. App. 226; S. A. U. & G. Ry. Co. v. Storey (Tex. Civ. App.) 172 S. W. 188; Jones v. Wright (Tex. Civ. App.) 92 S. W. 1010; Debes v. Greenstone (Tex. Civ. App.) 260 S. W. 211; Employers' Ins. Ass'n v. Herring (Tex. Civ. App.) 269 S. W. 249.

We conclude that the motion for rehearing should be overruled.